STATE OF CONNECTICUT *v.* RICHARD N. MAGNOTTI
(11501)

SHEA, DANNEHY, SANTANIELLO, CALLAHAN and F. HENNESSY, Js.

Argued November 8—decision released December 31, 1985

*Kevin C. Connors,* special public defender, with whom, on the brief, was *Michael J. Whelton,* special public defender, for the appellant (defendant).

*Paul M. Scimonelli,* special deputy assistant state's attorney, with whom were *Julia D. Dewey,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, and *Michael Dearington,* chief assistant state's attorney, for the appellee (state).

DANNEHY, J. The defendant was indicted for murder, in violation of General Statutes § 53a-54a, and, after a trial to the jury, found guilty of the lesser included offense of manslaughter in the first degree, in violation of General Statutes § 53a-55 (a). He claims on appeal that the trial court erred in denying his motion to suppress. He also claims that the prosecutor's improper comments on his failure to testify, to which he did not object at trial, require that his conviction be reversed. We find no error.

At the evidentiary hearing on the motion to suppress, the court, as trier of fact, could reasonably have found the following. On January 26, 1981, at approximately 1:55 a.m., Marion Millbank, who resided at 865 Mix Avenue, apartment 317, in Hamden, was awakened by the sounds of a struggle coming from apartment 417 directly above her. She got out of bed and went to the kitchen where she heard two angry male voices exchanging obscenities, heavy footsteps, and what sounded like bodies banging into cabinets in the kitchen upstairs. She also heard a scream and a male voice saying, "you'll break your mother's hand." She decided to call the police at approximately 2 a.m.

Officer Gary Komoroski of the Hamden police department was dispatched to the apartment building on Mix Avenue, arriving at 2:04 a.m. Sergeant Donald Gray and Officer George Kitsos arrived at approximately the same time. They went to apartment 417 and were let in by Louise Russell, mother of the defendant and wife of William Russell, the defendant's stepfather. The police officers observed William Russell lying face down

on the floor of the apartment. Komoroski checked Russell's body for vital signs but found none. Blood was splattered all about the apartment. It appeared to the investigating officers that the victim had been stabbed. Subsequent medical testimony confirmed that the cause of death was a stab wound to the chest which penetrated the heart. Louise Russell was then taken to a bedroom and advised of her rights.

Gray directed Komoroski to stand by the elevator on the fourth floor and to admit only police personnel onto the floor. At approximately 2:20 a.m., Mark Magnotti, the defendant's nephew, stepped off the elevator and was asked by Komoroski to identify himself and to state his reason for being there. Magnotti informed Komoroski that he had received a phone call from his grandmother, Louise Russell, telling him that the victim and the defendant had had a fight. She had asked Magnotti to come and pick up the defendant. Approximately twenty-five minutes later, at 2:45 a.m., the defendant stepped off the elevator onto the fourth floor. Komoroski asked him if he was Richard Magnotti and the defendant replied in the affirmative. Observing blood on the defendant's clothing, Komoroski immediately frisked the defendant for weapons. Komoroski then took the defendant to apartment 417 where Inspector John Cronin also noticed blood on the defendant's hands and clothes. At this point Detective Carmen Riccitelli, who had been interviewing the occupants of apartment 317, arrived and reported to the other officers the words heard by Millbank during the disturbance which had awakened her earlier that evening. The defendant was then formally arrested for the murder of William Russell.

We first address the defendant's claim that the trial court erred in denying his motion to suppress. Shortly before the defendant was formally arrested in his mother's apartment, the investigating officers required

him to remove his clothes, which thereupon were seized as evidence. Later that morning, at approximately 4:30 a.m., after the defendant had been taken to police headquarters, the officers took scrapings from beneath the defendant's fingernails. The clothing and fingernail scrapings were tested and found to contain blood matching that of the victim. The results of those tests were admitted into evidence at trial.

The defendant claims that his arrest was without probable cause and therefore that the seizure of his clothing and the later taking of fingernail scrapings were not justified as searches incident to a lawful arrest. *Chimel* v. *California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). With respect to the fingernail scrapings, the defendant makes the alternative argument that even if his arrest was lawful, the police were required to obtain a search warrant before conducting any further searches and seizures at police headquarters. We reject these contentions.

We agree with the defendant that he was "arrested" from the moment he stepped off the elevator and identified himself to Komoroski. As soon as he ascertained the defendant's identity, Komoroski frisked him and took him to apartment 417 where the other officers were congregated. Komoroski testified at the suppression hearing that he had the defendant in his custody, and would not have allowed him to leave. The defendant also testified at the suppression hearing, that he believed that he was not free to walk away from Komoroski.

" 'To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' " *State* v. *Derrico,* 181 Conn. 151, 159, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980);

*Dunaway* v. *New York,* 442 U.S. 200, 212, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). The presence of a formal declaration of arrest is not determinative. A person is "seized" within the meaning of the fourth amendment "when, by means of physical force or show of authority, his freedom of movement is restrained." *United States* v. *Mendenhall,* 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980). The test is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id., 554; *State* v. *Ostroski,* 186 Conn. 287, 291–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). Although in the present case the defendant was not formally arrested until he was taken to apartment 417, we believe that the circumstances evince a custodial arrest by Komoroski.

Our determination that the defendant was "arrested" as soon as he identified himself to Komoroski does not end our analysis. We must next determine whether Komoroski had probable cause to justify his arrest of the defendant. Probable cause to arrest exists if "(1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to believe that the person to be arrested committed that crime." *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1338 (1980); *State* v. *Guertin,* 190 Conn. 440, 446, 461 A.2d 963 (1983). " 'The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear that "[t]here is often a fine line between mere suspicion and probable cause, and '[t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances.' " ' " *State* v. *Dennis,* 189 Conn. 429, 431–32, 456 A.2d 333

(1983); *State* v. *Penland,* 174 Conn. 153, 155–56, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978).

Komoroski, when he took the defendant into custody, was aware that a disturbance had occurred in apartment 417 less than an hour earlier. He also knew from his interview with the defendant's nephew that the disturbance was caused by a fight between the defendant and the victim. The victim was dead, apparently from a knife wound, and the apartment in which he died was covered with blood. Komoroski noticed blood on the defendant's clothes as he stepped off the elevator. We believe that these facts were sufficient to sustain a reasonable belief that the defendant was involved in a fight with his stepfather which resulted in his stepfather's death. Since the defendant's arrest was supported by probable cause, the seizure of his clothing was fully justified as a search incident to a lawful arrest. *State* v. *Federici,* 179 Conn. 46, 54–55, 425 A.2d 916 (1979); see *State* v. *Asherman,* 193 Conn. 695, 704, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Therefore, the defendant's motion to suppress his clothing and the blood tests performed on them was properly denied.

We dispense briefly with the defendant's alternative claim that the police were required to obtain a warrant before conducting the later search and seizure at police headquarters, during which fingernail scrapings were taken from the defendant. The defendant contends that this follow-up search cannot be justified as a "search incident" because it was not contemporaneous with his arrest and, therefore, could be executed only pursuant to warrant. The United States Supreme Court has expressly rejected this contention in holding that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."

*United States* v. *Edwards,* 415 U.S. 800, 804, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). The police took the fingernail scrapings from the defendant at approximately 4:30 a.m., less than two hours after he was initially arrested. The defendant could easily have destroyed this evidence by washing his hands or otherwise. Under these circumstances we find that the police acted reasonably in taking the fingernail scrapings when they did. Id., 808 n.9. There is no error in the denial of the defendant's motion to suppress.

The defendant also claims that a new trial is required due to the allegedly improper comment by the prosecutor, during final argument, on his failure to testify in his own defense. No objection was taken to the allegedly improper comments at the time they were made, and thus the defendant does not claim error on the part of the trial court. We note that our seminal case of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), involved precisely the claim raised here, namely, that the prosecutor's summation to the jury violated the rule enunciated in *Griffin* v. *California,* 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). In *Evans,* we reviewed this claim under the second "exceptional circumstance" because it involves the colorable deprivation of a fundamental constitutional right and a fair trial. *State* v. *Evans,* supra, 70.

We have said that in cases of alleged prosecutorial misconduct, which do not involve a specific error committed by the trial court, the standard for analyzing the defendant's due process claims is the "fairness of the trial and not the culpability of the prosecutor . . . ." *State* v. *Glenn,* 194 Conn. 483, 491, 481 A.2d 741 (1984); *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Palmer,* 196 Conn. 157, 163, 491 A.2d 1075 (1985); *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464

U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982). Where the alleged misconduct involves the prosecutor's indirect comment on the decision of the accused not to testify, the test is whether the comment was " 'of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *State* v. *Evans,* supra, 72; *State* v. *Daniels,* 180 Conn. 101, 109, 429 A.2d 813 (1980). We now turn to the defendant's specific claims.

The defendant points to two instances during opening argument where the prosecutor stated to the jury that there were only three people in the apartment when the crime was committed. As the jury was well aware, the three individuals were William Russell, Louise Russell and the defendant. The defendant argues that by this "rhetorical 'process of elimination,' the prosecutor was able to focus his argument on the failure of the defendant to testify." We disagree.

To understand the prosecutor's comments properly, it is necessary to place in context the testimony of Louise Russell, the defendant's mother. Russell's testimony, which was highly exculpatory of the defendant, may be summarized as follows. Russell testified that at the time of her husband's death the defendant was in the throes of an epileptic seizure. According to Russell, the defendant was lying on the floor with his "eyes rolled back . . . foaming at the mouth [and] having tremors." During this time her husband was lying on top of the defendant and "punching" him in an attempt to bring him out of the seizure. Russell testified that when the seizure ended the defendant got up and left the apartment. During the entire incident she never saw her son in possession of a knife, and she did not see him stab her husband. She testified that there had been no argument that morning, and that in fact

her husband and son got along very well. Russell knew nothing of her husband's stabbing, although she was present during the entire incident, despite the fact that William Russell's body showed three stab wounds in addition to the fatal wound to the heart. According to Russell, after her son recovered from his seizure and left the apartment, she went to the bedroom and called her grandson, Mark Magnotti, to come and look for the defendant. As she returned from the bedroom she heard her husband fall and saw him slumped in a sitting position against the dining room wall. Not realizing that he was seriously injured, Russell went to the kitchen and began to clean the blood from the floor. Finally, just as she was about to check on her husband the police arrived and she let them in.

The prosecutor attempted to contradict the testimony of Russell with that of Millbank, the occupant of the apartment directly below who had initially reported the disturbance to the police. As stated, Millbank had heard male voices loudly exchanging obscenities, and one voice, which she could not identify, saying, "you'll break your mother's hand." The prosecutor argued to the jury that the victim must have uttered those words, and that he would not have done so if, as testified by Russell, the defendant was incapacitated by an epileptic seizure. When the prosecutor again reminded the jury that only three people were in the apartment, it was after his discussion of the wounds suffered by the victim. The prosecutor emphasized that the wounds to the victim's arms were probably inflicted while he tried to defend himself. He also stressed that the mortal incision had penetrated chest bone, noting that "[i]t took a little effort to get through there." Defense counsel, recognizing the implication of the prosecutor's argument, stated to the jury: "You may deduce that since there were only two persons present that it had to be either the Defendant or his mother and that his mother is too

small and too frail to have inflicted the type of injury."[1] If, in this context, the prosecutor employed a process of elimination, it was to show that the defendant and not his mother wielded the knife that caused the victim's death. This is obviously how trial counsel understood the argument, and we do not consider it natural or necessary that the jury understood it differently.

The defendant's final claim of improper comment concerns statements made by the prosecutor on rebuttal. During the defense argument, counsel emphasized to the jury what he believed to be an inconsistency in the state's position. Referring to the state's characterization of Russell's testimony, defense counsel stated: "They want to argue that this lady fabricated it. . . . They ask you to believe what she said except that when

---

[1] Defense counsel's argument was as follows:

"You may deduce that since there were only two persons present that it had to be either the Defendant or his mother and that his mother is too small and too frail to have inflicted the type of injury. Therefore, you could conclude I suppose according to the State's argument that he did it. You could conclude as well the exact opposite and some of you are asked when you reach a conclusion every reasonable hypothesis consonant with innocence must be overcome by the State. They want to argue that this lady fabricated it. But they offered her as a witness. They ask you to believe what she said except that when it gets to the question of intent don't believe her any more. They ask you to believe Mark Magnotti when he says that there was an argument or a fight or whatever but the real reason is because Richard apparently called him and said come and pick me up and he got lost. Now that's what they're saying to you. Your conclusions may very well be here that you will not find that the State has established that intent. And I believe and many of you if not all of you were asked that you may also consider in your deliberations some other offenses that are not the crime of murder. The Judge will instruct you on what the essential elements are of those offenses. In many of them you will find this element of intent. Now I'm not trying to justify the loss of a human life because I don't think anybody has the right to play God. What I'm trying to persuade you to accept is that tragic accidents do occur and they are not intended to be criminal. They are not performed in a criminal manner. They are not willful and intentional acts. They are sometimes not conscious acts. You will have to determine from what you heard here whether or not there had been a circumstance which was described by at least two witnesses as a seizure."

it gets to the question of intent don't believe her any more." At oral argument, counsel conceded that the primary issue at trial was intent, stating that the defendant's theory of the case was that the "decedent died of a stab wound during the course or during the time when the defendant was taken by this seizure."

In this context the prosecutor argued in rebuttal: "Counsel suggested—two people said the accused had a seizure. I know of one, Mrs. Russell. It's your recollection that counts. Did you hear Inspector Cronin say that the accused had a seizure? Counsel says I put on a witness, State puts on a witness and we vouch for everything they say. Ladies and Gentlemen, we put on all the evidence we can get. We put on Officers Komoroski, Gray, Kitsos, Cronin, Rhone [had] a heart condition we didn't put him on. We put on Mills. We put on the neighbor upstairs, downstairs, Mark Magnotti. We put on the witnesses who have all been mentioned as far as being there or in the area. What about the Defense's case? . . . Sergeant Gray, Inspector Cronin."

The defendant argues that the prosecutor's recitation of the state's witnesses, followed by the question "[w]hat about the Defense's case," particularly underscored the fact that the defendant had not testified. The evidence in this case was highly circumstantial, and the only eyewitness to the crime testified that the defendant, due to an epileptic seizure, could not have harbored the requisite intent to support a finding of guilt. The prosecutor sought to clarify that the state did not necessarily wish to be bound by the testimony of Russell on an all-or-nothing basis merely because it had called her as a witness. The prosecutor further sought to emphasize that the state had candidly presented all the witnesses who might be able to give some relevant testimony at trial. In perhaps becoming some-

what overzealous in his argument, the prosecutor drew a gratuitous comparison between the state's case and the defendant's.

We recognize the possibility that some of the jurors may have understood the prosecutor's question, "[w]hat about the Defense's case," as a comment on the defendant's failure to testify. We also recognize that "the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." *State* v. *Ubaldi,* supra, 575, quoting *State* v. *Laudano,* 74 Conn. 638, 646, 51 A. 860 (1902). We regard the challenged remark as a comment by the prosecutor on the overall quality of the defendant's evidence and not as calling specific attention to the failure of the accused to testify. *United States* v. *Savarese,* 649 F.2d 83, 87 (1st Cir. 1981). The accused, by his failure to testify, cannot insulate himself from general comment on the weakness of his case, even though his failure so to testify may be perceived by the jury as having contributed to the general weakness about which comment is made. The type of comment made in this case is not so far beyond the bounds of legitimate argument as to deny the defendant a fair trial. *State* v. *Palmer,* supra; *State* v. *Glenn,* supra.

There is no error.

In this opinion the other judges concurred.