## STATE OF CONNECTICUT *v.* GREGORY WALKER
### (13034)

PETERS, C. J., HEALEY, SHEA, GLASS and HULL, Js.

Argued December 1, 1987—decision released February 16, 1988

*James L. Radda,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* assistant state's attorney, for the appellee (state).

HULL, J. The defendant, Gregory Walker, appeals from his judgment of conviction, after a jury trial, of the crime of murder in violation of General Statutes § 53a-54a (a).[1] He raises four claims of error on appeal: (1) the prosecutor's comment on the defendant's post-arrest silence; (2) the prosecutor's comments on the defendant's failure to testify; (3) the admission into evidence of photographs of the victim's body; and (4) the insufficiency of the evidence to prove the defendant's guilt beyond a reasonable doubt. We find no error.

The jury could reasonably have found the following facts. On February 7, 1985, at 1:32 a.m., the Bridgeport police found the body of a male in an alley between the multi-service center and the special services police department office in Father Panik Village. The alley is approximately 100 feet long and six to seven feet wide. There were no lights in the alley. A fence surrounds the alley but the police officers at the scene were able to approach the body by walking through a hole in the fence. The alley was surrounded by residential buildings about 150 to 200 feet away, each containing eighteen to twenty-two units. The police saw no one in the alley or exiting it. The victim was identified on February 20, 1985, as Eddie Singletary, a resident of Passaic, New Jersey.

The victim was found in the snow with the hood of his orange and black jacket pulled over his head. A detective found one bullet near the victim's lower back and three spent Remington .25 cartridges near the head. The chief medical examiner found four bullet holes in the head. The cause of death was multiple gun shot wounds to the brain. Death most likely occurred between ten to twenty minutes and one hour after

[1] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

infliction of the wounds. The shots were probably fired from over two feet away. Detective Leo Krusinski spoke with the defendant at the detective bureau on March 5, 1985. The defendant was not under arrest. The defendant admitted he knew Singletary. He said that he and Singletary had come to Bridgeport from New Jersey and had arrived at 681 Hallett Street, the place where the defendant's wife was staying, at 5:30 a.m. on February 6. He and Singletary "hung around" and "got drunk." At about 4 p.m. that day he gave $20 to Singletary to take the train to Passaic. The defendant also said his sister's child had been molested by Singletary.

The last time Woodrow Minnick saw the defendant was in the company of Minnick's brother, Donald. They came to the Hallett Street address sometime after 8 p.m. that evening to watch a University of Pittsburgh basketball game. The Pittsburgh game began at 8 p.m. on February 6. Deborah Embry saw the defendant in the Hallett Street house asleep at 7:30 a.m. on February 6. Singletary also was there. They stayed in the house all day. At about 5:30 p.m. the defendant, Singletary and Janie Minnick, who was the defendant's wife, left. At 1 a.m. on February 7, 1985, Embry saw the defendant come through the front door and go to Janie's room.

The state's key witness was Donald Minnick, Janie's brother. When he was leaving work on February 6, 1985, he saw the defendant in his car with a man named Eddie. Eventually they went to the Hallett Street address to watch the Pittsburgh basketball game. They watched the game, staying until 10 or 11 p.m. The three of them then went to Father Panik Village in a car driven by the defendant. While the three of them were near building No. 17 the defendant and the victim said they were "going to take a leak." The victim and the defendant then walked over by the fence near building No. 17,

behind the office and into a dark alley. They were out of his sight while Minnick stood and waited for their return. He waited for about five minutes and then heard three or four gunshots, at close to midnight. He saw no other person in the area when the defendant came back from the alley. He then saw the defendant walking to the car approximately one or two minutes after hearing the gunshots. The defendant then told Minnick that "he was sorry" that "he had to do what he did, but it had to be done." Minnick said that at this point the defendant's mood was normal. The defendant told Minnick that Eddie had molested his niece "or something" although Minnick did not remember why he was told this. The defendant told Krusinski that he had questioned the victim about his niece but the victim denied that he had had anything to do with her.

I

CLAIMED ERROR IN THE PROSECUTOR'S COMMENTS ON THE DEFENDANT'S POST-ARREST SILENCE

No post-arrest statements by the defendant were introduced at the trial nor did the defendant testify. In his opening argument the prosecutor stated: "Think about it—Mr. Singletary comes to Bridgeport, for what reason? And in less than 24 hours after he arrives in Bridgeport, he is a dead man. Does it sound like a bad break on his part? Does it sound like it may have been planned? That this had been thought out? Because if you hit him in Bridgeport, Bridgeport doesn't know anything about it. You got no information on Eddie Singletary. Nobody is coming out of the woodwork to identify the body and Bridgeport won't get an identification on the individual and just say, hey, chalk it up—we tried. No, Detective Krusinski worked on this. They finally got verification of who this individual was and confirmed it. They did an investigation in New Jersey. He came back here and now he starts interview-

ing him. And Deborah Embry comes forward and says yeah, that man was in my house. He came here with Gregory Walker. And Gregory Walker was there the next day. And there was no Eddie Singletary. *Now if that were the case, and Mr. Walker had nothing to hide the next day, perhaps he would have been saying, hey, where is my friend Eddie?"* (Emphasis added.)

The defendant claims that this comment violated his due process rights under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[2] Although the defendant did not object to this comment he seeks appellate review under the second "exceptional circumstance" test in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), where the record adequately supports a claim that a defendant clearly has been deprived of a fundamental constitutional right and a fair trial. The defendant's claim is that the argument above violated his constitutional rights under *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The *Doyle* court held that "[t]he use for impeachment purposes of [the defendant's] silence at the time of arrest and after receiving *Miranda*[3] warnings, violated the Due Process Clause of the Fourteenth Amendment." Id., 619. This court does not usually review claims of error that

[2] The defendant nominally makes his due process claim under both the state and federal constitutions. " 'The due process clauses of the United States constitution, § 1, of the fourteenth amendment, and of the Connecticut constitution, article first, § 8, can be treated together because they "generally have the same meaning and impose similar constitutional limitations." *Keogh* v. *Bridgeport,* 187 Conn. 53, 60, 444 A.2d 225 (1982); *McKinney* v. *Coventry,* 176 Conn. 613, 616, 410 A.2d 453 (1979).' *Gunther* v. *Dubno,* 195 Conn. 284, 297 n.13, 487 A.2d 1080 (1985). The defendant proffers no argument for enhanced state constitutional protection and, on the facts of this case, we see no reason independently to perform such an analysis." See *State* v. *Thompson,* 197 Conn. 67, 76 n.6, 495 A.2d 1054 (1985).

[3] *Miranda* v. *Arizona,* 384 U.S. 436, 467–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

were not raised at trial. Practice Book § 4185. We will review the defendant's claim, however, because it involves his fundamental constitutional right to due process under the fourteenth amendment. *State* v. *Evans,* supra, 71.

The rationale of the *Doyle* rule is that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle* v. *Ohio,* supra, 618; *Wainwright* v. *Greenfield,* 474 U.S. 284, 291, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986); *State* v. *Shashaty,* 205 Conn. 39, 48, 529 A.2d 1308 (1987). "We do not see any reason why prosecutorial comment during closing argument is not analogous to cross-examination for the purpose of the application of this rule." *State* v. *Casey,* 201 Conn. 174, 185, 513 A.2d 1183 (1986).

The defendant claims that, unlike *State* v. *Casey,* where the defendant made post-arrest statements and testified at the trial, the defendant in this case did neither. Therefore, he claims the suggestion that he had something "to hide" the next day and the challenge to the defendant to explain why he did not inquire about the victim's whereabouts, constitute comment on the defendant's failure, after his arrest, to explain his silence on February 7 as to the victim's whereabouts.

The defendant's argument is wide of the mark. *Doyle* simply does not apply in this situation. The "where is my friend Eddie?" remarks were plainly related to the defendant's conduct on February 7, 1985, the day after Singletary had disappeared and one month before the defendant was arrested and received the customary *Miranda* warnings.

The defendant voluntarily went to the detective bureau on March 5, 1985. He received no *Miranda* warnings and was not under arrest. *Doyle* holds that

it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise. *Doyle* v. *Ohio,* supra, 615. *Doyle* does not apply to silence before the defendant is taken into custody and given *Miranda* warnings. "In this case, no governmental action induced [the defendant] to remain silent before arrest. The failure to speak occurred before the [defendant] was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case. We hold that impeachment by use of prearrest silence does not violate the Fourteenth Amendment." *Jenkins* v. *Anderson,* 447 U.S. 231, 240, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980); accord *State* v. *Shashaty,* supra, 49. "[P]re-arrest silence under circumstances where one would naturally be expected to speak may be used either as an admission or for impeachment purposes. McCormick, Evidence (3d Ed.) §§ 160, 270." *State* v. *Leecan* 198 Conn. 517, 522, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). We conclude that the prosecutor's comment in this case violated neither state nor federal due process rights of the defendant. This claim of error is without merit.

## II

### CLAIMED ERROR IN THE PROSECUTOR'S COMMENTS ON THE DEFENDANT'S FAILURE TO TESTIFY

The defendant claims that three comments of the prosecutor in closing argument constitute, either singly or collectively, comment on the defendant's failure to testify at trial.

Defense counsel did not object or take exception to two comments or ask for a curative instruction but objected to a third comment in the jury's presence. The prosecutor justified his comment as being directed to

something other than the defendant's failure to testify. Defense counsel did not request a formal ruling on his objection, nor did he take exception or request a curative instruction. In view of the landmark case of *State* v. *Evans,* supra, 71, where this precise issue was decided in favor of appellate review under similar circumstances, we will make such a review in this case. *State* v. *Magnotti,* 198 Conn. 209, 215, 502 A.2d 404 (1985).

The parameters of our inquiry are well established. "In its closing argument the state may properly call to the attention of the jury any portion of the evidence that stands uncontradicted. Such a comment becomes objectionable only when it focuses the attention of the jury on the failure of the defendant to testify and thus violates the holding of the United States Supreme Court in *Griffin* v. *California,* [380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965)], that 'the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' A test for evaluating a prosecutor's argument that has been adopted by several courts and approved by the Court of Appeals of this circuit in *United States ex rel. Leak* v. *Follette,* 418 F.2d 1266, 1269 (2d Cir.), cert. denied sub nom. *Leak* v. *Follette,* 397 U.S. 1050, 90 S. Ct. 1388, 25 L. Ed. 2d 665 [1970], seems adequate and proper: 'Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?' As that court noted in the same case: 'It has been held that remarks concerning lack of contradiction are forbidden only in the exceedingly rare case where the defend-

ant alone could possibly contradict the government's testimony.' See also *United States* v. *Lipton,* 467 F.2d 1161, 1168–69 (2d Cir. [1972]); *Ruiz* v. *United States,* 365 F.2d 103, 105 (10th Cir. [1966])." *State* v. *Evans,* supra, 71–72; *State* v. *Magnotti,* supra, 216; *State* v. *DeMartino,* 7 Conn. App. 292, 294–95, 508 A.2d 809 (1986).

This rule is embodied in General Statutes § 54-84 (a) which reads in part: "Any person on trial for crime . . . may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official . . . ."

COMMENT A—"WHERE IS MY FRIEND EDDIE?"

This comment has been described in more detail in part I above. The particular language that the defendant claims is objectionable is: "Now, if that were the case, and Mr. Walker had nothing to hide the next day, perhaps he would have been saying, hey, where is my friend Eddie?"

The defendant cites *State* v. *DeMartino,* supra, as authority for his claim that the quoted remarks constitute an indirect prosecutorial comment on his failure to testify. In *DeMartino,* the court held that the defendant's privilege against self-incrimination and his right to a fair trial were violated by the prosecutor's repeated comments on the failure of the defendant or his attorney to "tell" or "explain" certain events. Id., 293–94.

Even though the egregious prosecutorial misconduct described in *DeMartino* warranted a new trial, the present case is sharply different. A single comment is involved. We have concluded that it refers to the defendant's conduct on the day after the crime when he must have been aware of Singletary's disappearance.

This comment does not by any stretch of the imagination amount to an unconstitutional indirect comment on the defendant's failure to testify.

COMMENT B—"DID YOU HEAR ANYBODY GET UP AND SAY IT WAS HIM?"

In his closing argument defense counsel had stressed that Donald Minnick had committed the murder. In reply, the prosecutor stated the following in his final closing argument: "See the only defense he has in this case is to make you believe that the person, that is a witness against him and says yeah, I was there and I was the only one there, except for Gregory Walker who walked in the area of the alleyway, through this fence with Eddie Singletary whom he brought from New Jersey, when he comes out by himself, I am the only one there with him. It's easy to say well, good then nobody—but you two are the only ones that know about this and you are giving the statement and telling the police what happened well the easiest thing to do or the only defense he has is to say well maybe it was him, possibly. Hey, it might be him. *Did you hear anybody get up and say it was him?* It's conjecture and speculation and you can't do that in a criminal case."(Emphasis added.)

The defendant admits that Donald Minnick's testimony was uncontradicted and that the state may properly call such a fact to the jury's attention. He claims, however, that the comment focused the jury's attention on his failure to testify. He claims that this is one of those " 'exceedingly rare case[s] where the defendant alone could possibly contradict the government's testimony.' " *State* v. *Evans,* supra, 72.

In his argument to the jury defense counsel had stressed the claim that Donald Minnick did the shooting. In the course of commenting on Donald Minnick's testimony, defense counsel stated: "That is the alley-

way, and buildings on the south, some at the far end of this picture you looked at, were probably 700 feet away but he acknowledged there were buildings much closer that were not in the picture. So, there were buildings at least on the north side, 100 feet away. Yet nobody sees anything. There are shots fired, 12:00 or 12:30 a.m. Nobody sees a thing. And, according to Donald's testimony . . . he and Gregory stayed at the scene after Gregory came out for a minute or two. And nobody is there. Nobody sees them. Nobody has anything to report to the police. Yet we have buildings full of people. And nobody sees the—a thing. He says that Gregory walked out—Donald Minnick says that Gregory walked out of the alleyway. Well, just speaking for human nature in general if Gregory Walker did this crime he would not have been walking out of that alleyway, to think it is clear that he would have been running fast."

The prosecutor attempted in final argument to negate the claim that Donald Minnick was the responsible party. He pointed out the lack of motive on Donald Minnick's part, that there was no testimony placing Donald Minnick as a witness at the murder scene and that the defense was making Donald Minnick the main candidate because there were no witnesses. He then said if "[t]here were that many shots, why didn't anybody come out and see these individuals here? Did you hear any people from Father Panik Village come in here and testify they heard anything or saw anything? No, you didn't." It was at this point the prosecutor made the remarks quoted above and asked, "Did you hear anybody get up and say it was him?"

In this context the prosecutor was responding to the defense allegations and claiming that if Donald Minnick had been the murderer someone from the particular area of Father Panik Village should have been avail-

able to testify that he was the killer. In the framework of the defense arguments and the prosecution's responsive comment on the lack of witnesses from Father Panik Village testifying to Donald Minnick's involvement in the murder, we conclude that the argument was not of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.

COMMENT C—"YOU NEVER VIEWED THE DEMEANOR OF THE DEFENDANT."

During his argument defense counsel had asked the jury to consider the defendant's demeanor as testified to by everybody who had seen him on February 6 and February 7, 1985, as follows: "There was never any indication in his demeanor that he was upset, that he was annoyed when he was with Eddie, there was no problem, nothing that he indicated that there was a problem between the two. Supposedly after he fired these shots Donald Minnick testified that there was no problem. He walks out cool as a cucumber and that's the end of that; no problem." Counsel further stated that "much in Donald Minnick's demeanor might indicate that he was either involved in it or knew something about it."

In his final argument the prosecutor made the following rebuttal argument. "Demeanor of the witnesses. Demeanor of witnesses is how they were viewed by you when they testified, what they had to say and the manner in which they said it. *You never viewed the demeanor of the defendant.*" (Emphasis added.) Defense counsel objected that this remark was both "far afield" and an improper comment on the defendant's demeanor at trial, defense counsel's earlier comment having been limited to events near or at the date of the crime. The prosecutor then explained his comment as follows:

"Mr. Lacobelle: If your Honor please, he brought up demeanor of the witnesses. In the same breath he mentioned demeanor of people on the stand. It would allow me to continue—I was going to point out his demeanor that he suggests them to consider, comes from something other than what was shown on trial. And I think that is perfectly acceptable since he brought it up.

"The Court: Well you may not comment on his lack of testimony in the trial. That is clear.

"Mr. Lacobelle: I don't intend to.

"The Court: As long as you do not, or make sure you do not.

"Mr. Lacobelle: Any demeanor that you are to consider of the witnesses, the demeanor here, again, to consider somebody else's demeanor at another time, place, that is based on what you hear from other witnesses. This individual obviously comes out of the alley and says gee, I am sorry, it had to be done. Again, slight remorse. The fact that Mr. Minnick says he doesn't come out, raving mad or waving a gun is to mean that he didn't do it. I don't believe that, that this is a reasonable and logical conclusion. I think the only thing you can see is that this was a well planned act that was carried out as an execution by Mr. Walker and for a specific purpose."

Defense counsel did not request a formal ruling on his objection, nor did he take exception. Counsel did not request a curative instruction nor was one given. The defendant, however, claims that the italicized words constituted an unconstitutional indirect comment on his failure to testify. He points out that the words used were not a comment on the strength of the state's case; *State* v. *Kluttz,* 9 Conn. App. 686, 705, 521 A.2d 178 (1987); or on the weakness of the defendant's case

or overall quality of the defendant's evidence. *State* v. *Magnotti,* supra, 220. Rather, he claims the remarks were "so far beyond the bounds of legitimate argument as to deny the defendant a fair trial." Id. We agree that this comment was error, but, on the basis of this record, we conclude that it was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967).

When viewed in connection with the preceding comment on demeanor of witnesses the offending words can only be taken as an indirect comment on the defendant's failure to testify and are therefore, standing alone, improper. The state admits as much.

The court, however, charged the jury on the demeanor of witnesses, and the right of the defendant to refrain from testifying. Absent an indication to the contrary, the jury is presumed to follow the instructions. *State* v. *Williams,* 204 Conn. 523, 534, 529 A.2d 653 (1987). After the objection to the remarks the prosecutor very clearly limited his comments to "somebody else's demeanor at another time, place, that is based on what you hear from other witnesses." The remarks were not highlighted in any way by defense counsel's objection or by any comment of the judge. The prosecutor's explanation of his remarks on "demeanor" went directly to the defendant's behavior on the given date. We conclude that the remarks were satisfactorily clarified by the prosecutor and, as thus delimited, not of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify. The record as a whole supports our conclusion beyond a reasonable doubt that the prosecutor's comment did not contribute to the verdict and, therefore, constituted harmless error. *Chapman* v. *California,* supra, 24–26.

## III

### CLAIMED ERROR IN ADMITTING INTO EVIDENCE PHOTOGRAPHS DEPICTING THE BODY OF THE VICTIM

At trial the court allowed into evidence exhibit L, a photograph of the victim's head prior to the autopsy for purposes of identification of the body. The defendant objected to any photograph for identification of the victim since the victim's mother was present in court to testify that the body she saw at the office of the chief medical examiner was that of her son. The trial court recognized that exhibit L was gruesome but admitted it for identification and found that its probative value outweighed its prejudicial effect. The state then offered into evidence exhibits M and N, one showing the side and one showing the top of the victim's head before the autopsy. The court noted that the photographs of the wounds might be relevant to proof of the defendant's intent. The defendant objected on the ground that the medical examiner could adequately explain the location of the wounds in the victim's head. The court allowed exhibits M and N into evidence on the ground once again that their probative value outweighed any prejudicial effect.

"The principles governing the admission of potentially inflammatory photographic evidence are clear. 'As this court has stated on a number of occasions, we adhere to the general rule that photographs which "have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry" are not rendered inadmissible simply because they may be characterized as "gruesome." . . . When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial

court's determination as to whether their value as evidence outweighs their possible prejudicial effect. . . . Since the trial court exercises its broad discretion in such circumstances, its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown.' (Citations omitted.) *State* v. *Piskorski,* 177 Conn. 677, 700–701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); see *State* v. *DeJesus,* 194 Conn. 376, 381–82, 481 A.2d 1277 (1984); *State* v. *Haskins,* 188 Conn. 432, 452, 450 A.2d 828 (1982); *State* v. *Smith,* 174 Conn. 118, 122–23, 384 A.2d 347 (1977)." *State* v. *Falcon,* 196 Conn 557, 565–66, 494 A.2d 1190 (1985).

" ' "[T]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." ' " *State* v. *Smith,* 185 Conn. 63, 88, 441 A.2d 84 (1981), quoting *State* v. *Piskorski,* supra, 701–702. The trial court did not abuse its discretion in admitting the photographs.

## IV

### CLAIMED INSUFFICIENCY OF THE EVIDENCE

At the close of the evidence the defendant moved for judgment of acquittal on the ground of insufficiency of the evidence. The court denied the motion and the defendant excepted.

It is axiomatic that in reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom. *State* v. *Cobbs,* 203 Conn. 4, 7, 522 A.2d 1229 (1987); *State* v. *Cates,* 202 Conn. 615, 627, 522 A.2d 788 (1987). There is no legal distinction between direct

316

and circumstantial evidence as far as probative force is concerned. *State* v. *Crump,* 201 Conn. 489, 495, 518 A.2d 378 (1986).

The defendant bases his argument principally on his claims that: (1) Donald Minnick did not witness the shooting or see the gun; (2) there were no problems between the defendant and the victim; and (3) the defendant appeared normal when walking back from the fence area. The state presented evidence that the defendant and the victim entered a dark alleyway together, that the victim died of multiple gunshot wounds to the brain, that there was no other person in the area when the defendant came back from the alley, that the defendant told Donald Minnick that "he was sorry that he had to do what he did," and that the defendant said that the victim had molested his niece. There was more than sufficient evidence for the jury to conclude beyond a reasonable doubt that the defendant was guilty of murder.

There is no error.

In this opinion the other justices concurred.