STATE OF CONNECTICUT *v.* THOMAS E. MARRA, JR.
(13965)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and BERDON, Js.

Argued February 18—decision released June 1, 1992

*Susan M. Hankins,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. This appeal concerns several issues arising out of the criminal trial of the defendant, Thomas E. Marra, Jr. The state charged the defendant with the crime of murder in violation of General Statutes § 53a-54a (a)[1] in connection with the death of Alex Palmieri on February 6, 1984. Following the defendant's conviction, the court sentenced him to a term of sixty years imprisonment. He appealed to this court under General Statutes § 51-199 (b) (3).[2] We affirm the judgment.

The jury could reasonably have found the following facts principally from the testimony of Nicholas Byers and Frank Spetrino, associates of the defendant. On February 6, 1984, the defendant asked Byers to drive

---

[1] General Statutes § 53a-54a provides in pertinent part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 51-199 (b) (3) provides in pertinent part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years."

the fifteen year old victim, another associate of the defendant, to the defendant's house later that day. At the same time, the defendant asked Spetrino if he would help him put the victim in a barrel. That evening, Byers drove the victim, Spetrino and Tamara Thiel, the victim's girlfriend, to the defendant's house. The defendant, the victim, Byers and Spetrino entered the defendant's garage, while Thiel remained in the car.

In the garage, the defendant and the victim argued about the defendant's desire that the victim leave Connecticut and reside for a time in Italy, and the victim's refusal to do so. When the matter was not resolved to the defendant's satisfaction, he handed Spetrino an aluminum baseball bat and told Spetrino not to let the victim leave the garage. Thereafter, as the group began to exit the garage, Spetrino struck the victim in the head with the bat. After Spetrino had hit the victim from one to three times, the defendant said, "Let's get him in the refrigerator." Spetrino then began to drag the victim toward a refrigerator that was located inside the defendant's garage. As he was being dragged, the victim began to speak incoherently, and the defendant said, "Shut up Alex. You didn't go to Italy." When the victim failed to quiet down, the defendant struck him on the head with the bat numerous times. The additional blows made the victim bleed heavily and caused some of his brain tissue to protrude from his skull. The defendant, Byers and Spetrino then placed the victim into a large refrigerator, and the defendant closed and padlocked the door. The men then loaded the refrigerator into the back of a rented van, and the defendant and Spetrino drove the van to a parking area near the Pequonnock River, where the river empties into the harbor in downtown Bridgeport. After making several holes in the refrigerator with an axe so that it would sink, the defendant and Spetrino slid the refrigerator into the water and it floated away. Although a police

dive team searched the harbor for the victim's body and the refrigerator for a period of five months, the divers could locate neither. The victim has not been seen or heard from by his family or friends since February 6, 1984.

On appeal, the defendant claims that: (1) the trial court lacked personal jurisdiction to try him because the state offered insufficient evidence at his probable cause hearing; (2) the trial court improperly admitted testimony regarding certain items of physical evidence that the state had lost; (3) the trial court improperly admitted irrelevant evidence of a sneaker, sock and two foot bones; (4) the trial court improperly charged the jury regarding the testimony of accomplices; (5) the trial court improperly broadened the charging document; (6) portions of the state's closing argument constituted impermissible comment upon the defendant's right to remain silent; (7) the trial court gave improper preliminary instructions to the jury regarding proof beyond a reasonable doubt; and (8) the trial court improperly marshalled the evidence in favor of the state.

I

The defendant first claims that the evidence submitted at his probable cause hearing was insufficient to establish that the victim had died. He asserts, therefore, that the trial court was without personal jurisdiction to try him for the offense of murder. We disagree.

Because the defendant was charged with the crime of murder in violation of § 53a-54a, he was entitled to a probable cause hearing pursuant to article first, § 8, as amended, of the Connecticut constitution[3] and Gen-

[3] The constitution of Connecticut, article first, § 8, as amended, provides in pertinent part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ."

eral Statutes § 54-46a,[4] and, on April 23, 1987, such a hearing was held. At the hearing, the state presented three witnesses: Byers, Thomas J. Scanlon, a Bridgeport police officer, and Theresa Palmieri, the victim's stepmother.

Byers offered the following testimony. In 1984, at the defendant's request, he drove the victim and Spetrino to the defendant's house. Upon their arrival at the defendant's house, Byers, Spetrino, the victim and the defendant entered the defendant's garage. While inside the garage, the defendant handed Spetrino an aluminum baseball bat. As he did so, the defendant whispered to Spetrino something to the effect of "don't let [the victim] get out of here." As the victim began to leave the garage, the defendant said, "Okay, let's go," and Spetrino struck the victim in the side of the head with the baseball bat. After being struck once with the bat, the victim fell to the floor where Spetrino hit him "a couple" more times. Although the victim remained conscious, Spetrino and the defendant dragged him toward a used refrigerator that was stored in the garage. As they dragged the victim, the victim began to yell, and the defendant then struck him on the head with the bat fifteen to twenty times. As the defendant was striking the victim in the head, the victim's "brains were spilling out." When the defendant ceased striking the victim, the victim was placed into the refrigerator, and the defendant closed and padlocked it. The locked refrigerator containing the grie-

[4] General Statutes § 54-46a provides in relevant part: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause."

vously injured victim was then placed into a van that the defendant drove away from his house. Byers testified that the victim did not lose consciousness at any time while he was being assaulted and that, even after he was placed into the refrigerator, he continued to mumble incoherently. Two days after the incident in the garage, the defendant told Byers that, if he talked, there was a "drum big enough for [him]."

Scanlon stated that he had participated in a search of the defendant's garage on October 7, 1985. He testified that sixteen soil and wood samples had been removed from the garage and sent to the state forensic laboratory. The forensic laboratory reported that some of the samples taken from the garage contained human blood. Scanlon also testified that he had determined that the defendant had rented a van on February 6, 1984, and had returned it on February 7, 1984.

Theresa Palmieri testified that in February, 1984, the victim was fifteen years old. She also stated that prior to the first week in February, 1984, the victim had lived with her and her husband, the victim's father, on a continual basis. She testified that she had not seen her stepson since the first week of February, 1984, and she knew of no other person who had had any contact with her stepson from that time forward. Byers, too, testified that, following the assault in the defendant's garage, he had never seen the victim again.

At the conclusion of the probable cause hearing, the trial court, *Reilly, J.,* found that there was probable cause to try the defendant for the crime of murder. Prior to trial, the defendant asserted that the trial court was without jurisdiction to try him for murder because the evidence elicited at the probable cause hearing was insufficient to prove that the victim was dead. After reviewing the transcript of the probable cause hear-

ing, the trial court, *S. Freedman, J.,* stated that it found the evidence offered sufficient to establish probable cause.

"Article first, § 8, of the Connecticut constitution, as amended, provides in part that '[n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law.' " *State* v. *Boyd,* 214 Conn. 132, 135, 570 A.2d 1125 (1990). In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. *In re Keijam T.,* 221 Conn. 109, 115, 602 A.2d 967 (1992); *State* v. *Mitchell,* 200 Conn. 323, 336, 512 A.2d 140 (1986). " 'The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . .' " (Citations omitted.) *In re Keijam T.,* supra, 115–16. We have held, however, that where the evidence offered at a probable cause hearing is insufficient to establish probable cause, the trial court lacks jurisdiction over the defendant's person. *State* v. *McPhail,* 213 Conn. 161, 170, 567 A.2d 812 (1989); *State* v. *Mitchell,* supra, 331.

We conclude that the trial court had jurisdiction to try the defendant because the evidence offered at the probable cause hearing would have warranted a person of reasonable caution to find that the victim died as a result of the injuries intentionally inflicted upon him by the defendant. Although there was no direct evidence that the victim had died as a result of his injuries, a reasonably cautious person could have drawn

that inference. It was clear that the victim had been grievously injured by the defendant. The blows to the victim's head had been so forceful and numerous as to break open his skull causing his brains to "spill out." Although he was obviously in grave condition, he was placed into a locked refrigerator and driven away in the back of a van, events hardly conducive to his speedy recovery. Moreover, neither Byers nor the victim's parents ever saw him again. Although the victim might have been conscious or semi-conscious when Byers last saw him, given all of the circumstances, a reasonably cautious person could properly have concluded that the victim had died as a result of the defendant's actions.

## II

The defendant next claims that the trial court improperly admitted testimony concerning sixteen blood-stained soil and wood samples that had been removed from the defendant's garage and had been later lost by the state. He asserts that the admission of that testimony deprived him of his right to a fair trial. We are not persuaded.

At a hearing on the defendant's motion to suppress the evidence, Scanlon testified that he had assisted members of the state forensic laboratory in conducting a search of the defendant's garage on October 7, 1985. Scanlon stated that, as a result of the search, he and the state forensic personnel had packaged sixteen soil and wood samples, had removed them from the garage and had forwarded the samples to the state forensic laboratory. Immediately following the search, Scanlon completed a diagram that indicated the specific locations within the garage from which each sample had been taken. William Hughes, an inspector with the Bridgeport state's attorney's office, testified that he had delivered the evidence to the state forensic laboratory. Elaine Pagliaro, a supervisor at the state

forensic laboratory, testified that, beginning on October 21, 1985, she had conducted tests for the presence of blood on each of the sixteen samples that had been taken from the defendant's garage. Pagliaro further testified that she had determined that human blood had been present on seven of the samples, animal blood had been present on one of the samples, and blood from an unknown source had been present on the remaining eight samples. On June 10, 1986, James Giammattei, another inspector, had transported the evidence from the forensic laboratory to the state's attorney's office.

On April 23, 1987, at the defendant's probable cause hearing and in the presence of the defendant and his attorney, Scanlon stated that the sixteen samples had been removed from the defendant's garage by himself and personnel from the state forensic laboratory. Scanlon further testified that the forensic laboratory had tested the samples, and the forensic laboratory's report was marked for identification purposes. On May 31, 1989, the results of Pagliaro's tests were formally revealed to the defense in response to a motion for disclosure. Thereafter, on January 3, 1990, the state became aware that it could not locate the evidence and promptly reported its loss to the court and the defendant. Despite his knowledge, prior to January 3, 1990, of the existence of the test results, the defendant had not earlier requested to view or test the soil and wood samples.

At trial, the defendant moved to suppress all testimony regarding the lost evidence, and a suppression hearing was held. The defendant argued that the state's loss of the evidence prejudiced him because his own experts were unable to test the evidence. Following argument by the defendant and the state, the trial court ruled that it would admit the evidence, but would allow the defendant great latitude in cross-examination and

would deliver an adverse inference instruction to the jury. Thereafter, over the defendant's objection, the state presented testimony regarding the blood found in the soil and wood samples. At the close of the trial, the court instructed the jury that, if the state did not produce evidence that it would ordinarily be expected to produce, the jury could infer that the evidence was unfavorable to the state.[5]

" ' "[T]he requirements of due process are met in the trial of a person accused of crime if he has been given the benefit of a fair and impartial trial in accordance with the settled course of judicial proceedings in this state.". . .' " (Citation omitted.) *State* v. *McIver*, 201 Conn. 559, 565, 518 A.2d 1368 (1986). Whether the defendant was deprived of a fair trial by the admission of testimony concerning the lost soil and wood samples depends upon " 'the reason for the unavailability of the evidence, the materiality of the evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, and the prejudice to the defendant caused by the unavailability of the evidence.' " *State* v. *Boucino*, 199 Conn. 207, 229, 506 A.2d 125 (1986); *State* v. *Hamele*, 188 Conn. 372, 381, 449 A.2d 1020 (1982).

In the particular circumstances of this case, we conclude that the admission of testimony regarding the lost evidence did not deprive the defendant of his right to due process. First, the trial court found, and the defendant has not claimed otherwise, that the state had not acted maliciously or in bad faith in losing the evidence.

---

[5] The trial court instructed the jury as follows: "Ordinarily, the State need not produce all the evidence available in a case. If however you find that there was evidence which was available only to the State which you feel it naturally would have produced and such evidence was not produced, you may, you don't have to, but you may, if you feel you have reason to [do] so considering all the circumstances, including the reason the evidence is missing, draw the inference that the evidence was unfavorable to the State. It is entirely up to you whether you do or do not draw such an inference."

*State* v. *McIver,* supra; *State* v. *Boucino,* supra; *State* v. *Hamele,* supra, 382. Second, although, as in *State* v. *Hamele,* supra, it is possible that an examination of the samples by a defense expert might have revealed, contrary to the opinion of the supervisor of the state forensic laboratory, that: (1) no human blood was present in the samples; or (2) any human blood that was present was not the blood of the victim, and although either conclusion would have benefited the defendant, he "failed to seek an independent testing of the evidence while it was available or in a timely fashion, and suggested the possibility of such testing only after he learned that the evidence had been destroyed." *State* v. *Hamele,* supra. Third, although it is possible that the state's tests were inaccurate, there was no evidence of any error in the state's procedures. Furthermore, as the trial court noted, Pagliaro made detailed notes of her tests, taking great care to distinguish her results regarding each of the sixteen samples. Finally, the defendant was given full opportunity to cross-examine the state's witnesses regarding both the testing and the loss of the evidence; *State* v. *Boucino,* supra; and the trial court informed the jury that it could infer that the lost evidence was unfavorable to the state. *State* v. *Hamele,* supra. Accordingly, we conclude that the state's loss of this evidence did not deprive the defendant of his right to due process.

## III

The defendant also claims that the trial court improperly admitted into evidence a sneaker, a sock and two human foot bones. The defendant asserts that this evidence should have been barred because it was irrelevant and more prejudicial than it was probative. We disagree.

Spetrino testified at trial that, following the assault on the victim, the defendant drove the victim, locked

inside the refrigerator, to a location in downtown Bridgeport on a bank of the Pequonnock River where the river empties into Long Island Sound. Spetrino stated that, after he and the defendant had made several holes in the refrigerator so that it would sink, they had slid it out of the van and into the river. Spetrino stated that he had watched the refrigerator for a short time and he had noticed that it did not sink, but rather floated on the water.

Although the victim's body was never discovered, on June 20, 1986, Lillian Somohano, while walking on a sandbar near Seaside Park in Bridgeport, about two nautical miles from the area where the victim had been placed in the water, discovered a sneaker and sock containing what appeared to be part of a human foot. She telephoned the police to inform them of her discovery. The sneaker was a white, size ten, Pro Champs brand with a high top that could be zipped off to convert the sneaker from a high top to a low sneaker. Additionally, there was a velcro strap around the top of the sneaker. William C. Rodriquez III, a forensic anthropologist, testified that the sneaker and sock contained two human bones and a quantity of human tissue. Rodriquez testified that the bones were the left heel bone and left toe bone of a caucasian male between the ages of fourteen and fifty years. Rodriquez noted that there were barnacles on the sneaker, and that the decomposition of the tissue was consistent with its having been in the water for an extended period of time.

Evidence was offered as to the type of footwear that the victim had been wearing when he was assaulted by the defendant. At trial, Thiel testified that on February 6, 1984, when the victim had entered the defendant's garage, he had been wearing white, high top sneakers that had a zipper so that the top could be zipped off to convert the sneakers from high to low style. When Thiel was shown the picture of the sneaker

that Somohano had discovered, she stated that "those are the sneakers that Alex has." She stated that she recognized the sneakers based upon the zipper, the Pro Champs insignia, the designs on it and the style. Thiel testified that she would "bet [her] life" that Alex had been wearing Pro Champs of that type on the night he was last seen.[6] Byers also testified that when the victim had been assaulted, he had been wearing white, high top sneakers with a velcro band. Spetrino testified that he recalled that the victim had been wearing red and white sneakers with a zipper on the back so that they could be worn as high or low tops. At first, Spetrino stated that he was fairly certain that the victim had been wearing Nike sneakers, but when he was shown a photograph of the sneaker that Somohano had discovered, Spetrino testified that it "looks like the sneaker Alex was wearing." He testified that the sneaker that Somohano had discovered was the same style and had the same removable high top as the sneaker the victim had been wearing.

At trial, the defendant filed a motion in limine asking that the issue of the admissibility of the sneaker, sock and foot bones be heard before any attempt to introduce them into evidence.[7] When the state moved

---

[6] In an interview with the police on August 5, 1986, however, Thiel stated that, on the night of February 6, 1984, the victim had been wearing white, high top sneakers made by Nike or Adidas. In the course of that same interview, however, when Thiel was shown a pair of Pro Champs like the ones that Somohano had found she stated that they were "exactly the same pair of sneakers that [the victim] was wearing." In that same interview, Thiel stated that she thought that the victim had worn "about a [size] thirteen" sneaker.

[7] In the motion in limine the defendant stated that the sneaker, sock and bones should not be admitted into evidence because: "(a) No scientific evidence exists connecting the alleged victim with any or all of the items . . . .

"(b) To permit such evidence or reference thereto would be highly prejudicial to the Defendant in that such evidence will permit the jury to speculate as to whether or not they belong to the victim.

"(c) Such evidence is insufficient as a matter of law to establish the identity of the victim in this case or to the actual owner in any case."

to make the items full exhibits, the defendant objected, arguing that they had not been sufficiently linked to the victim to be relevant to the case.[8] The trial court stated that the state had not proved conclusively that the sneaker, sock and bones were those of the victim, but it found that, in conjunction with the other evidence in the case, this evidence tended to support the state's allegation that the victim was dead. The trial court ruled that the sneaker, sock and bones were admissible and that the weight to be given the evidence should be determined by the jury. The defendant took exception.

The defendant claims on appeal that the sneaker, sock and bones should not have been admitted because they were irrelevant. Specifically, the defendant asserts that: (1) the time and location of the discovery of the items were too remote from the time and place of the disposal of the victim to be relevant; (2) there was conflicting testimony regarding the style of sneaker that the victim was last wearing; (3) the size of the discovered sneaker was inconsistent with testimony concerning the victim's shoe size; and (4) there was no scientific testimony offered regarding blood type or DNA structure of the bones or tissue.[9] We conclude that the trial

---

[8] The defendant argued that the items had not been "connected other than by inference, innuendo or speculation to the deceased . . . ." He further argued that the sneaker and bones could belong to any number of other persons who were believed to be missing in the harbor, and that the jury could not fairly infer that the sneaker and bones were those of the victim. He argued that, because the jury could not connect the sneaker to any issue in the case, other than through impermissible speculation, the evidence was not relevant.

[9] The defendant also argues in his brief that even if the exhibits were marginally relevant, because they were "repugnant" and likely to arouse unduly the jury's emotions, hostility and sympathy, and inflame it against the defendant, the trial court should have excluded the evidence because its prejudicial nature outweighed its probative value. *State* v. *DeMatteo,* 186 Conn. 696, 702–703, 443 A.2d 915 (1982). At trial, however, the defend-

court properly determined that the evidence was sufficiently relevant to be admissible.

It is axiomatic that, in order to be admissible, evidence must be relevant to an issue in the case in which it is offered. "Evidence need not be conclusive to be relevant . . . and [t]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Joly,* 219 Conn. 234, 252, 593 A.2d 96 (1991). Evidence is relevant if it "has a logical tendency to aid the trier in the determination of an issue. *State* v. *McClendon,* 199 Conn. 5, 8–9, 505 A.2d 685 (1986)." *State* v. *Jeffrey,* 220 Conn. 698, 704, 601 A.2d 993 (1991). We have also held that "evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." *State* v. *Rinaldi,* 220 Conn. 345, 353, 599 A.2d 1 (1991); *State* v. *Jeffrey,* supra, 706.

In the instant case, the state had the burden of proving beyond a reasonable doubt that the victim was dead. To that end, it offered the testimony of Byers and Spetrino who indicated that the victim had been severely beaten by the defendant, locked inside a refrigerator and dumped into the water. Although both men testified that the victim had been grievously injured, neither could conclusively state that the victim had actually expired prior to being placed in the water.[10] The

ant failed to raise this alternative objection to the introduction of the evidence, and we will not review it for the first time on appeal. *State* v. *Pinnock,* 220 Conn. 765, 796, 601 A.2d 521 (1992).

[10] In fact, there was evidence that indicated that Spetrino heard the victim making gurgling noises as the refrigerator filled with water.

sneaker, sock and bones were obviously offered to attempt to establish that the victim was in fact dead.

Although the evidence could not be conclusively linked to the victim, we conclude that it tended to support the state's contention that the victim had indeed died as a result of the defendant's actions. It would certainly have been reasonable for the jury to infer that the person to whom the sneaker, sock and bones had once belonged was dead. The defendant argues, however, that it could not reasonably be inferred that the dead person was the victim in this case. The testimony of Byers, Spetrino and Thiel, however, if credited, could have established that the sneaker that was admitted into evidence was identical to the sneaker that the victim was wearing when he was assaulted and put into the refrigerator. Further, the victim's body had been placed into the water at a point from which the river flows in the direction of the sandbar where the sneaker was discovered two nautical miles away. Additionally, Rodriquez, a forensic expert, testified that the bones and tissue were those of a caucasoid male between the ages of fourteen and fifty, and that their condition was consistent with having been immersed in water for an extended period of time. Although there were inconsistencies in the testimony regarding the brand and size of the sneakers that the victim was wearing, those discrepancies affect the weight of the evidence and not its admissibility. *Tuccio* v. *Zehrung,* 172 Conn. 350, 354, 374 A.2d 1044 (1977). Similarly, the remoteness in the time and place of the discovery of the sneaker, sock and bones are issues that go to the weight to be accorded the evidence and not its admissibility. Finally, although the bones were not conclusively linked to the victim through blood or DNA testing procedures, we have never required the introduction of conclusive scientific proof to establish relevancy. See *State* v. *Piskorski,* 177 Conn. 677, 696, 419 A.2d 866, cert.

denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Accordingly, we conclude that the evidence was relevant because it had a tendency to prove that the victim was dead, an essential element of the state's case.

## IV

The defendant next asserts that the trial court's instruction regarding accomplice testimony improperly bolstered the testimony of Byers and Spetrino and that the instruction amounted to plain error. We do not agree.

At trial, both Byers and Spetrino testified that they had been present when the defendant had murdered the victim, and that they had assisted the defendant in committing the murder. Both witnesses revealed that their testimony had been provided pursuant to agreements with the state. Byers stated that he had initially spoken to the police because he had been told that he would be charged with the murder and that he would go to jail for forty years. He declared that he was testifying pursuant to his understanding that, if he was truthful, he would not be prosecuted for his involvement in the victim's death. Spetrino testified that before he had provided any information to the police, he had the "feeling" that he could be charged as a result of his involvement in the victim's death. Spetrino further stated that his testimony also had been given as a result of an agreement with the state. He said that he had been assured that if he told the truth and if he had not actually committed the murder, he would not be charged regarding the victim's death, and that the state would also assist him in resolving several unrelated cases pending against him.

Prior to deliberations, the trial court explicitly informed the jury that the credibility of witnesses and the weight to be given their testimony was within its

province. The jury was also instructed that it could credit all or any portion of a witness' testimony, and that it should keep in mind all the circumstances of the witness' testimony, including any possible bias or prejudice of the witness.

Specifically regarding the weight to be given to accomplice testimony, the trial court instructed as follows. "Certain of the witnesses, Nickie Byers and Frank Spetrino by their own testimony, participated in the criminal conduct charged by the State in this case and they are what the law calls accomplices. In weighing the testimony of an accomplice who was a self-confessed criminal, you should consider that fact. All odds being equal, it may be that you would not believe a person who has committed a crime such as this involving moral wrong as readily as you would believe a person of good character. The amount of moral wrong involved in the participation of the witness in the crime should be weighed. Also in weighing the testimony of an accomplice who has not yet been sentenced or his case has not yet been disposed of or who has not been charged with offenses in which the State has evidence, you should keep in mind that he may in his own mind be looking for or hoping for some favorable treatment in the sentence or disposition of his own case or not being arrested. And therefore, he may have such an interest in the outcome of this case that his testimony may [have] been colored by that fact. Therefore, the jury must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.

"Ladies and gentlemen, on the other hand, there are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. Each accomplice's testimony is an admission by him against his own natural interest in not incriminating himself.

And therefore, it may itself be evidence of his testimony's reliability. It is for you to decide what credibility you will give to a witness who has admitted his involvement and criminal wrong doing, whether you will believe or disbelieve the testimony of a person who by his own admission has committed or contributed to the crime charged by the State here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

The defendant now claims that the portion of the instruction indicating that the jury might find that it was against the interests of an accomplice to testify, unfairly bolstered the testimony of Byers and Spetrino because it was clearly in their interests in this case to inculpate the defendant. The defendant concedes that this claim was not preserved at trial, and he now seeks plain error review. Practice Book § 4185.[11]

Plain error review " 'is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.' *State* v. *Hinckley*, 198 Conn. 77, 87–88, 502 A.2d 388 (1985)." *State* v. *Jeffrey,* supra, 710–11. " 'The conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he [or she] testifies. When those conditions exist, it is the duty of the judge to specially caution the jury . . . .' *State* v. *Carey,* [76 Conn. 342, 349, 56 A. 632 (1904)]." *State* v. *Brown,* 187 Conn. 602, 613, 447 A.2d 734 (1982). "In reviewing a challenge to a portion of the jury instructions, the proper test is 'whether the charge, considered as a whole, presents the case

---

[11] Practice Book § 4185 provides that this court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The supreme court may in the interests of justice notice plain error not brought to the attention of the trial court."

to the jury so that no injustice will result.' *State* v. *Estep,* [186 Conn. 648, 652, 443 A.2d 483 (1982)]." *State* v. *Shindell,* 195 Conn. 128, 143, 486 A.2d 637 (1985).

An examination of the totality of the trial court's instructions reveals that the charge extensively cautioned the jurors to consider the potential motivations and biases of accomplice witnesses. In its charge the court explicitly cautioned the jury that the testimony of the accomplice witnesses may have been colored by their potentially compelling interests in seeking favorable treatment for themselves from the state. Although the challenged portion of the trial court's accomplice instructions may have been inappropriate under the circumstances of this case, we conclude that it did not so dilute the overall instructions so as to result in any injustice to the defendant and did not constitute plain error.

V

The defendant next claims that the trial court improperly permitted the jury to find that he had caused the victim's death in a manner that was not charged in the information. As a result, he argues that the trial court enlarged the offense specified in the information in violation of his constitutional right to be informed of the charges against him under the sixth amendment to the federal constitution and article first, § 8 of the constitution of Connecticut.[12] We find no constitutional violation.

The information alleged, in relevant part, that the defendant "did assault with a baseball bat, and cause

[12] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."

Similarly, article first, § 8 of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be informed of the nature and cause of the accusation . . . ."

the death of the said Alex Palmieri." The trial court's instructions, however, could reasonably have allowed the jury to find that the defendant caused the victim's death by assaulting him with a bat *and* by placing the injured victim into the water while locked inside a refrigerator.

Because the defendant asserts that the trial court's instruction violated his constitutional rights, he requests review under *State* v. *Golding,* 213 Conn. 233, 239–41, 567 A.2d 823 (1989).[13] In order to prevail on appeal under *Golding,* "the defendant must meet all of the following conditions: '(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' *State* v. *Golding,* supra, 239–40." *State* v. *Pinnock,* 220 Conn. 765, 778, 601 A.2d 521 (1992). "We have also held that we remain free to dispose of the claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) Id.

"The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and . . . to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense . . . ." (Internal quotation marks omitted.) *State* v. *Scognamiglio,*

---

[13] Initially, the defendant argues that he adequately preserved this claim at trial. Our review of the transcript, however, reveals that he did not.

202 Conn. 18, 22, 519 A.2d 607 (1987); *State* v. *Franko,* 199 Conn. 481, 490, 508 A.2d 22 (1986); *State* v. *Sumner,* 178 Conn. 163, 168, 422 A.2d 299 (1979).

The two ways of causing the death of the victim in this case, either by striking him in the head with a bat or by placing him in the water in a locked refrigerator, would simply constitute two methods of committing the same crime, i.e., the victim's murder. The defendant's conviction under either scenario would consequently bar a subsequent prosecution for that crime. *State* v. *Scognamiglio,* supra, 22. Because the defendant's conviction is sufficient to bar reprosecution, to establish an infringement of his right to be informed of the nature and cause of the accusations against him, he must demonstrate that the trial court's instructions caused him prejudicial surprise or detrimentally affected the presentation of his defense. *State* v. *Franko,* supra, 490.

We conclude that the defendant was not prejudiced by the trial court's instruction. The record is devoid of anything to indicate that the defendant would have altered his defense in any way had the information specifically provided that the victim's death was caused by assaulting him with a baseball bat *and* by placing him in the water in a locked refrigerator. At trial, the defendant primarily challenged the state's allegation that he had been involved at all in killing the victim, and he did not challenge the state's allegations regarding the manner in which the victim's death was caused. In large part, the defense focused on discrediting the testimony of the state's chief witnesses, Byers and Spetrino, who purported to be the only eye witnesses to the killing. The defendant raised questions about their biases and their abilities accurately to recall events by offering evidence that they had secured immunity from the state and that they both had significant histories of drug and alcohol abuse. In his closing argu-

ment, the defendant vigorously contended that the testimony of Byers and Spetrino constituted the heart of the state's case and that it was not credible.

In addition to his attack upon the reliability of Byers' and Spetrino's testimony, the defendant further argued that the state had not proved beyond a reasonable doubt that the victim had been killed. He asserted that the victim's body had never been located, and that the state had offered scant physical evidence of the victim's death. He attacked the probative value of the sneaker and foot bones discovered on the sandbar, arguing that they could not rationally be connected to the victim. Further, the defendant argued that the blood located on the floor of his garage was not linked to the victim, and that the location and quantity of that blood was inconsistent with the state's theory of the case.

Contrary to the state's theory that the victim had been killed, the defendant offered evidence to indicate that the victim was not, in fact, dead, but had left the country. Evidence was offered to indicate that the victim had possessed a passport, had relatives in Argentina and had packed his bags prior to his disappearance. Further evidence was offered that the victim was alive on February 11, 1986, five days after his alleged death, and that he had been present at a travel agency and had exchanged airline tickets on that date. In his closing argument, the defendant suggested that the jury could more reasonably find that the victim had traveled to Argentina, rather than that he had been killed by the defendant.

Further, the defendant offered evidence specifically challenging the state's theory that the victim had been placed into a refrigerator and then into the harbor. The only witnesses called to testify for the defense were Ralph Sperrazza, Jr., Dusdavo A. Lopez and Robert P. Valenti, each of whom offered evidence tending to

counter the state's theory that the victim had been placed in a refrigerator. Sperrazza testified that he had purchased the defendant's home in January, 1986, and that there had been a freezer in the basement of the home. Sperrazza and Lopez provided descriptions of the freezer that were similar to the descriptions of the refrigerator allegedly used to dispose of the victim's body. Valenti testified that, in 1984, the defendant had given him a refrigerator with locks on it, and that he had seen it last in 1987. Valenti described that refrigerator as similar to the refrigerator that had allegedly been used to dispose of the victim's body. Additionally, the defendant argued that if the victim had been placed into a refrigerator and thereafter into the water, the police dive team that had spent five months looking for the refrigerator would have been able to locate it in Bridgeport harbor. He also argued that the state's theory that he had rented a van to carry the refrigerator to the harbor was unrealistic. First, he suggested that it would be more sensible to use a stolen van rather than to leave a paper trail by renting one, and second, he noted that the van's odometer showed that the van had travelled several more miles than would have been necessary to complete the route that Spetrino described as having been taken to dispose of the victim.

On appeal, the defendant has not suggested any additional evidence that he would have offered had he been more specifically notified that the state was alleging that he had caused the victim's death by assaulting him with a bat *and* placing him into the refrigerator and then into the water. The defendant cites only one instance wherein he purportedly relied on the information as written and was therefore prejudiced by the trial court's instruction. He asserts that in the course of closing argument his counsel contended, "They didn't accuse Thomas of drowning him in the water. They didn't accuse him of shooting him. They accused

Thomas Marra with beating this kid with a baseball bat. They chose the direction they were going to take." Later in the same argument, however, his counsel stated, "This is a charge of murder beyond a reasonable doubt. Do we have beyond a reasonable doubt that a refrigerator went into the water? Because in order for you to make an inference that death occurred, in order for you to make any type of an inference, the fact upon which you are being asked to draw, the inference must itself be proven beyond a reasonable doubt." He also argued, "You have to make the assumption that [the victim] was hit with a baseball bat, that he was put in a refrigerator, that he was thrown in the water to the exclusion of any other possibilities." Because we conclude that the defendant has not demonstrated any way in which the presentation of his defense was prejudiced by the trial court's expansion of the information, he cannot prevail on this claim of constitutional error. *State* v. *Golding*, supra.

## VI

Additionally, the defendant claims that the state violated his privilege against self-incrimination under the fifth amendment to the United States constitution and article first, § 8 of the Connecticut constitution by commenting in its closing argument on the defendant's silence.[14] The defendant asserts that the state's commentary invited the jury to infer guilt from the defendant's silence, and that the comments could only be understood by the jury as an unconstitutional criticism of the defendant's failure to testify. We disagree.

The defendant challenges the comments made by the prosecutor in both the initial and rebuttal portions of

[14] The fifth amendment to the United States constitution provides in relevant part that no person shall "be compelled in any criminal case to be a witness against himself . . . ."

Article first, § 8 of the Connecticut constitution provides in relevant part: "No person shall be compelled to give evidence against himself . . . ."

his closing argument. First, in his initial argument, the prosecutor stated: "There were only four people who knew about this in the garage. Two of them testified in front of you and told you what they knew and what they observed, but you heard from the third one too, Mr. Marra. And what did Mr. Marra say? Well, Mr. Marra said a lot. Basically his testimony corroborates everything that Mr. Spetrino and Mr. Byers told you." The state then proceeded to review several out-of-court admissions made by the defendant that the state argued corroborated the testimony of Byers and Spetrino.

The defendant also attacks comments made by the state in its rebuttal argument. At trial, the state offered evidence that the defendant had purchased airline tickets for the victim, presumably because he had wanted the victim to leave the area. In response to the defendant's closing argument, the prosecutor commented that, "[w]ith respect to tickets, tickets for the airline, you never heard anything about why Mr. Marra is buying [the victim] tickets." At trial, the state also produced evidence that Spetrino had been covered with blood as a result of the beating of the victim, and that the defendant and his wife had provided Spetrino with a gray sweat suit. The state had also produced a letter from the defendant to his wife that could reasonably be construed as a request to her to forget that they had given the sweat suit to Spetrino. In rebuttal argument, the state again commented on defense counsel's closing argument, "[w]ith respect to the gray sweat suit, he never explained why he writes his wife a letter and mentions specifically the gray sweat suit unless it, in fact, happened; that a gray sweat suit was provided Mr. Spetrino on the night of the incident. Never touches that." The state also produced at trial evidence of letters sent by the defendant to several people that could reasonably be viewed as requests to those persons to assist the defendant by eliminating evidence against

him. The state commented, "[n]ever touches why three letters immediately come out from Mr. Marra on just after the October 28th interview. Never says why he is mailing letters to Brenda, to Maria, to James Kallman." Regarding several contradictory admissions by the defendant, the prosecutor stated, "[h]ave you heard any reasons why he gave those false, contradictory stories? No. That was completely *forgotten by counsel.*" (Emphasis added.) Finally, the state offered evidence that, after the victim had been killed, the defendant had written a letter, purportedly from the victim, to Thiel, in which he explained that the victim would soon return to Connecticut. The state argued, "[h]ave you heard any legitimate reason why he is writing letters attributed to Alex if not to make it seem by at least one witness, Tammy, that Alex is still alive?"

The defendant concedes that this issue was not preserved at trial, and he now seeks review of this claim under *State* v. *Golding,* supra, and as plain error under Practice Book § 4185.

In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: "Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" (Internal quotation marks omitted.) *State* v. *Negron,* 221 Conn. 315, 325, 603 A.2d 1138 (1992); *State* v. *Walker,* 206 Conn. 300, 307, 537 A.2d 1021 (1988). We have also recognized that " 'closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that

a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' *Donnelly* v. *DeChristoforo,* 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)." *State* v. *Glenn,* 194 Conn. 483, 495, 481 A.2d 741 (1984).

First, regarding the initial portion of the state's closing argument, we conclude that the state's comments would not naturally and necessarily be taken as a comment on the defendant's failure to testify, and that the state did not intend them to have such an effect. Contrary to the defendant's assertion that the state was improperly commenting on his right to remain silent, these initial comments do not concern the defendant's silence at trial. Rather, they plainly concern admissions that the defendant had previously willfully made. The state argued that the jury could reasonably find evidence of the defendant's guilt from the defendant's own admissions, not his silence. The defendant further asserts, however, that the state's reference to the fact that Byers and Spetrino had testified at trial improperly called the jury's attention to the fact that the defendant had not testified. Although it is possible that the jury drew that conclusion, such a strained interpretation of the state's argument by the jury would be neither necessary nor natural.

Second, we also conclude that the jury would not naturally or necessarily take the state's rebuttal argument as a comment on the defendant's failure to testify, and it is obvious that the state had no such intent. "In its closing argument the state may properly call to the attention of the jury any portion of the evidence that stands uncontradicted. Such a comment becomes objectionable only when it focuses the attention of the jury on the failure of the defendant to testify and thus violates the holding of the United States Supreme Court in *Griffin* v. *California,* [380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85

S. Ct. 1797, 14 L. Ed. 2d 730 (1965)], that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (Internal quotation marks omitted.) *State* v. *Walker,* supra, 307.

We believe the challenged remarks on rebuttal could only be reasonably interpreted as commentary "by the prosecutor on the overall quality of the defendant's evidence and not as calling specific attention to the failure of the accused to testify." *State* v. *Magnotti,* 198 Conn. 209, 220, 502 A.2d 404 (1985). The state made all of the challenged comments on rebuttal in the context of defense counsel's closing argument, and not in regard to the defendant's failure to testify. The portions of the state's argument attacked by the defendant obviously were intended by the state to demonstrate that defense counsel had failed to contradict critical portions of the state's evidence in his final argument. When the state commented that "you never heard," "he never explained," "never touches that," and "never says why," it was plainly referring to the fact that the jury never heard any argument offered *by defense counsel* that would contradict the state's proof. After noting that the jury never heard any reasons for the defendant's inconsistent admissions, the state commented, "That was just completely forgotten *by counsel.*" (Emphasis added.) In view of this reasonable interpretation of the state's closing argument, the jury would not naturally or necessarily have concluded that the state was commenting on the defendant's failure to testify. Therefore, the state's comments did not clearly deprive the defendant of his constitutional privilege against self-incrimination.[15] *State* v. *Golding,* supra.

[15] Moreover, it seems strange that, if the state's comments were as egregious at trial as they have been depicted on appeal, no contemporaneous objection was made.

## VII

The defendant further claims that the trial court's preliminary instructions to the prospective jurors regarding the reasonable doubt standard were improper and violated his right to a fair trial.[16] Specifically, he claims that the court's instructions regarding two hypotheticals diluted the state's burden of proof. We do not agree.

We have thoroughly reviewed both the trial court's preliminary and final instructions. In its preliminary instructions to the prospective jurors, the court accurately defined proof beyond a reasonable doubt. The court then proceeded to relate two hypotheticals to the prospective jurors, apparently to assist the prospective jurors in distinguishing between the concepts of "reasonable doubt" and "possible doubt." At the conclusion of the trial, the court again instructed the jury regarding the definition of proof beyond a reasonable doubt. Its final instruction was a detailed and accurate explanation of the state's burden of proof.

The defendant concedes that this claim was not preserved at trial, and he requests review under the plain error doctrine and *State* v. *Golding,* supra, 239–41. We conclude that the court's preliminary instructions regarding the standard of proof beyond a reasonable doubt did not constitute plain error and were not a clear constitutional violation. Although " '[j]udicial attempts to clarify the meaning of the phrase "reasonable doubt" by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead,' " such illus-

---

[16] The defendant also asserts that the trial court's preliminary instruction to the jury regarding circumstantial evidence was improper. Because he has failed to brief that claim, we consider it abandoned, and will not review it further. *Gaudet* v. *Safeco Ins. Co.,* 219 Conn. 391, 403, 593 A.2d 1362 (1991).

trations do not necessarily constitute reversible error. *State* v. *DelVecchio*, 191 Conn. 412, 420–21, 464 A.2d 813 (1983). " '[T]he question on appeal is whether the court's statements correctly conveyed the concept of reasonable doubt to the jury." Id., 421. In determining whether preliminary jury instructions require reversal, we must ask whether the " 'jury was fully and properly instructed at the critical time, after all the evidence and after the arguments of counsel.' " *State* v. *Lewis*, 220 Conn. 602, 614, 600 A.2d 1330 (1991).

Our review of the preliminary instructions and the hypotheticals in this case reveals no prejudice to the defendant. Additionally, the jury was fairly and completely instructed regarding the state's burden of proof beyond a reasonable doubt at the conclusion of the trial. As a result, the defendant was not deprived of his right to a fair trial, and may not prevail under *State* v. *Golding*, supra, because he has not demonstrated that an error of constitutional dimension clearly exists. Similarly, the preliminary instructions did not affect the fairness or integrity of the proceedings and, therefore, did not constitute plain error. *State* v. *Jeffrey*, 220 Conn. 698, 710–11, 601 A.2d 993 (1991).

## VIII

Finally, the defendant claims that the trial court's instructions unfairly marshalled the evidence, drawing the jury's attention to the state's case and obscuring the defendant's case. He asserts that the instructions violated his federal and state constitutional rights to due process. We do not agree.

In its instructions to the jury following the trial, the court stated: "If at any time you feel I am indicating a preference for one side or the other, if I should mention one side more than the other, let me assure you the Court is neutral. Please do not try to read my mind or interpret the tonal quality of my voice. . . . I may

make comments to you as to the weight of evidence or the propriety or lack of propriety of your finding certain facts in that evidence. But where I do make such comments, they are merely suggestive for you to approve or disapprove in the exercise of your own judgment. . . . If I do refer to certain evidence, don't assume that I mean to emphasize that evidence nor must you or should you limit your consideration only to it. If I overlook any evidence, you will supply it from your own recollection."

A review of the body of the court's charge reveals several instances in which the court summarized evidence offered by the state, and then provided a less detailed reference to the defendant's case. In addition, however, the trial court specifically marshalled defense evidence of the potential biases of the state's chief witnesses, Byers and Spetrino, and of prior bad acts by Spetrino.

"[W]e have stated that a charge 'must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven.' " *State* v. *Hernandez,* 218 Conn. 458, 462, 590 A.2d 112 (1991). "To avoid the danger of improper influence on the jury, a recitation of the evidence ' "should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." ' " Id. The trial court, however, "has broad discretion to comment on the evidence adduced in a criminal trial. *State* v. *James,* 211 Conn. 555, 571, 560 A.2d 426 (1989)." Id., 461.

Unlike *Hernandez,* where we concluded that the trial court's charge was improper, the court here did not recapitulate "nearly all of the state's testimonial and

physical evidence" and did not frequently comment "favorably on the credibility of the state's witnesses . . . ." Id., 464. Although the court did provide a more detailed account of some of the state's evidence than of the defendant's counter evidence, it also delivered an accurate and complete cautionary instruction and specifically marshalled the defendant's evidence regarding the credibility of the state's primary witnesses. Although the trial court's charge might have included more references to the defendant's evidence or theory of defense, we cannot say that the charge as given did any injustice or caused any prejudice to the defendant. Id., 465; *State* v. *Gordon,* 197 Conn. 413, 424–25, 504 A.2d 1020 (1985); *State* v. *Ballas,* 180 Conn. 662, 680, 433 A.2d 989 (1980). One obvious reason more time was spent in marshalling the state's evidence is simply that there was more of it. We conclude that the manner in which the trial court marshalled the evidence did not deprive the defendant of his right to due process.

The judgment is affirmed.

In this opinion the other justices concurred.