STATE OF CONNECTICUT *v.* ANTHONY L. JOHNSON
(14587)

Foti, Schaller and Shea, Js.

126

Argued October 2, 1996—officially released January 21, 1997

*Dara K. Storch*, certified legal intern, with whom were *Richard Emanuel*, assistant public defender, and, on the brief, *Kyun Yi*, certified legal intern, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan*, state's attorney, and *Steven Weiss*, assistant state's attorney, for the appellee (state).

SHEA, J. After a jury trial, the defendant was convicted of assault in the second degree in violation of General Statutes § 53a-60 (a) (2)[1] and larceny in the

---

[1] General Statutes § 53a-60 (a) provides in pertinent part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause

sixth degree in violation of General Statutes § 53a-125b.[2] The jury found him not guilty of robbery in the first degree, as charged in the first count of the substitute information. In his appeal from the judgment, the defendant claims that his right to a fair trial was violated (1) by remarks of the prosecutor during closing argument, (2) by the trial court's instructions on circumstantial evidence, and (3) by the selection of two of the six jurors while the original trial judge was absent and a different judge was presiding over the voir dire. We affirm the judgment.

From the evidence presented, the jury could reasonably have found that on September 13, 1994, at approximately 7:15 a.m., the defendant entered a supermarket in Stamford using a cane because of a cast on his foot. He attracted the attention of Carl Anderson, a store security officer, who continued to observe the defendant as he picked up several packages of film. Anderson saw the defendant stop in one of the aisles and put film in several pockets of his clothing. The defendant then went to the delicatessen counter and ordered a sandwich. The clerk handed him the sandwich wrapped in paper. Anderson observed the defendant stuff the sandwich into his pants and go to the other end of the store, where he talked with some store employees. Anderson went to the front of the store and waited for the defendant.

When the defendant came to the front of the store, he walked past the cashiers and proceeded toward the exit door. At that point, Anderson and Peter Pearce,

physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

[2] General Statutes § 53a-125b provides: "(a) A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a-119 and the value of the property or service is two hundred fifty dollars or less.

"(b) Larceny in the sixth degree is a class C misdemeanor."

the store manager, who had seen the defendant walk past the cashiers, approached the defendant. Anderson told the defendant that he had been watched and asked whether he had forgotten to pay for something. The defendant responded affirmatively. He removed a package of film from one of his pockets and said that he wanted to pay for it. When Anderson said he believed that the defendant had additional rolls of film, the defendant produced several other film packages. After Anderson mentioned the sandwich, the defendant removed a wrapped sandwich from inside his pants.

Anderson and Pearce informed the defendant that they would have to call the police. The defendant asked them not to call the police and offered to pay for the merchandise. Pearce replied that it was too late and told the defendant to come with him and Anderson to the rear of the store. After the defendant had responded by pushing them aside in an attempt to move toward the exit, Anderson and Pearce each took hold of one of his arms and escorted him down a grocery aisle to the rear of the store. The defendant began to curse and, halfway down the aisle, he freed his right arm and swung his cane at Pearce, striking him three times between the eyes. Anderson and Pearce wrestled the defendant to the floor. After he seemed to calm down, they helped him to stand up and pulled him into a back room to await the police.

In the room, the defendant said he would not create any more trouble, but, when his arms were released, he turned and punched Anderson in the nose, causing it to bleed. Pearce and Anderson again forced the defendant to the floor and sat on him to await the arrival of the police, whom another store employee had called.

Pearce sustained a hairline fracture of his nose and two black eyes. When the police arrived, they handcuffed the defendant and took him to the police station.

# I

## PROSECUTOR'S ARGUMENT

The defendant claims that the prosecutor, during his summation to the jury, violated the defendant's constitutional right to a fair trial by referring to facts on which evidence had been excluded by the trial court and also by making remarks that infringed upon his fifth amendment right not to testify at trial.

### A

During the cross-examination of Anderson, defense counsel inquired whether his employer, in the course of training him as a security officer, had informed him of the ramifications of a false arrest and the responsibility the store would bear for injury to a person claimed to have been shoplifting. Anderson responded affirmatively. After similar testimony was elicited from Pearce during cross-examination, the state on redirect examination, referring to defense counsel's questions concerning false arrest, inquired whether the defendant had ever made any claim of false arrest in connection with the incident at the Stamford store. Pearce responded, "None whatsoever." Defense counsel objected that the question called for speculation. The court sustained the objection on the ground of irrelevance and ordered the answer stricken.

During his summation for the state, the prosecutor referred to the questions asked of Anderson and Pearce concerning false arrest: "Well, the defendant never claimed any false arrest when the police were at the scene and they never claimed any false [arrest] through any of the witnesses. You didn't hear it." Later, in support of the credibility of the state's witnesses, he argued: "[Y]ou remember that they testified under oath and there is no evidence that they have any beef with the defendant. *There is no evidence that there was any*

*law suit*." (Emphasis added.) After the defendant had presented his argument and the state had concluded its rebuttal, the defendant, in the absence of the jury, objected to the state's references to false arrest and to a civil suit therefor on the ground that the court had sustained an objection to the state's inquiry about such an action. The court remarked that it was the defendant who had opened the door by his questions to Anderson and Pearce about the training they had received from their employer regarding false arrest and ruled that the prosecutor's argument was proper.

On appeal, the defendant relies on the well established principle that it is improper for counsel to refer to facts that are not supported by the evidence. *State* v. *Williams*, 204 Conn. 523, 544, 529 A.2d 653 (1987); *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). The remark of the prosecutor that "[t]here is no evidence that there was any law suit," however, does not violate that principle but, in the context of the preceding statement that "there is no evidence that [Anderson and Pearce] have any beef with the defendant," simply pointed out one circumstance arguably reinforcing the credibility of his witnesses. There is no prohibition against relevant argument based on the absence of evidence in a case that an opposing party would ordinarily be expected to produce if it existed. *Matza* v. *Matza*, 226 Conn. 166, 186, 627 A.2d 414 (1993); *Tragakiss* v. *Dowling*, 183 Conn. 72, 74, 438 A.2d 818 (1981). Even if there had been no prior reference to a civil suit for false arrest, the remark that a witness had no reason, such as an interest in a lawsuit, to color his testimony would not have been improper.

The defendant also claims that the statement regarding the absence of evidence of a suit for false arrest was a deliberate defiance of the trial court's ruling striking the defendant's response to the prosecutor's inquiry

concerning such an action. In *State* v. *Ubaldi*, supra, 190 Conn. 569–70, our Supreme Court exercised its supervisory power to grant a new trial where the prosecutor's summation referred to evidence that the trial court had excluded. "Where a prosecutor . . . interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." Id., 575. The ruling of the trial judge that the prosecutor's comment was "proper argument" indicates that he did not regard it as offensive. We also do not view the challenged remark of the prosecutor in this case as a deliberate flaunting of the trial court's ruling on evidence, but as an appropriate comment on the absence of a circumstance that, if it had been present, would have militated against the credibility of the state's witnesses by indicating some interest on their part in the outcome of the trial.

B

The defendant claims that portions of the prosecutor's summation also constituted an impermissible comment on the defendant's failure to testify at trial in violation of his fifth amendment privilege against self-incrimination as decided in *Griffin* v. *California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). The defendant did not raise this claim either in the trial court or in his original brief in this court. At oral argument, however, we granted his motion for permission to raise the self-incrimination issue in a supplementary brief because, despite the failure to raise it previously, it qualifies for appellate review under the strictures of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state does not dispute that "the claim is of constitutional magnitude alleging the violation of a fundamental [constitutional] right" and that "the record

is adequate to review the alleged claim of error." Id., 239. Appellate review of similar belated claims of prosecutorial comment on a criminal defendant's failure to testify has frequently been granted. *State* v. *Marra*, 222 Conn. 506, 533, 610 A.2d 1113 (1992); *State* v. *Walker*, 206 Conn. 300, 306–307, 537 A.2d 1021 (1988); *State* v. *Magnotti*, 198 Conn. 209, 215, 502 A.2d 404 (1985); *State* v. *Evans*, 165 Conn. 61, 70–71, 327 A.2d 576 (1973).

The standard of review of a prosecutorial remark claimed to violate the prohibition against commenting on a defendant's failure to testify is whether the language used was "manifestly intended to be" or "was . . . of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *State* v. *Evans*, supra, 165 Conn. 72. In support of his claim, the defendant cites three excerpts from the state's argument: (1) "[T]he defendant never claimed any false arrest when the police were at the scene and they never claimed any false [arrest] through any of the witnesses. You didn't hear it." (2) "Now, the defendant did make comments to the police. And we heard that. He did not sit on his rights and refuse to answer questions and keep his mouth shut, and be silent. He had a lot to say. What is significant is he never said anything . . . you know, they set me up. I was beaten up. I'm the victim and they're trying to cover up a beating that they gave me. He said a lot of things, but he never said any of those things." (3) "There is no evidence that there was any law suit."

There is no reasonable basis in the first statement for concluding that the jury "would naturally and necessarily" take it to refer to the defendant's failure to testify at trial. The phrase, "when the police were at the scene," refers explicitly to the defendant's conduct at the time of his arrest, not at the trial. The mention of the failure to claim false arrest "through any of the witnesses"

plainly does not refer to the defendant at all but to the testimony of the witnesses produced by the state and cross-examined by the defendant.

The second statement of the prosecutor, which refers to what the defendant told and did not tell the police, is also clearly confined to the defendant's conduct at the time of his arrest. We perceive nothing in that argument implicating the defendant's failure to testify at trial.

The defendant claims that, in the third statement, concerning the absence of any evidence of a false arrest suit, the prosecutor indirectly commented on the defendant's failure to testify because he was calling for information that only the defendant could have provided. See *State* v. *Correia*, 33 Conn. App. 457, 468, 636 A.2d 860, cert. denied, 229 Conn. 911, 642 A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130 L. Ed. 2d 174 (1994). The defendant would not have had to take the witness stand, however, in order to prove that he had commenced a lawsuit. Any number of people, such as the clerk of court or other court personnel, could have established that fact.

We conclude that the defendant's claim of prosecutorial comment on his failure to testify is wholly lacking in merit.

## II

### JURY INSTRUCTIONS

The defendant claims next that the court's instructions to the jury relating to circumstantial evidence were inadequate because there was no specific instruction applying the reasonable doubt standard of proof to such evidence and the inferences to be drawn therefrom. He refers to the following portions of the charge on circumstantial evidence: "Circumstantial evidence is indirect evidence, that is, proof of a chain of facts from which you could find that another fact exists even

though it has not been proved directly. . . . Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense. . . . What a person's intention or knowledge has been is usually to be determined by inference. . . . The only way a jury can ordinarily determine what a person's intention or knowledge was at any given time, aside from that person's statements or testimony, is by determining what that person's conduct was and what circumstances were surrounding that conduct and from that infer what his purpose, intention or knowledge was. . . . To draw such an inference is not only the privilege but also the proper function of the jury, provided, of course, that the inference drawn complies with the standard for inferences as explained earlier by me." The defendant contends that he is entitled to a new trial because of the absence from the charge on inferences and intent of any reference to the state's burden of proving guilt beyond a reasonable doubt. He also maintains that the court should have instructed the jury that an inferred fact, such as intent, must be proved beyond a reasonable doubt.

A

The defendant took no exception to any part of the charge and, in order to prevail on this unpreserved claim, must demonstrate the existence of the four conditions set forth in *State* v. *Golding*, supra, 213 Conn. 239–40: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental [constitutional] right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

The state focuses on the third *Golding* condition, arguing that no constitutional violation clearly exists that deprived the defendant of a fair trial. We agree. In explaining the state's burden of proof, the court charged that it "must prove beyond a reasonable doubt, each and every element of the crime charged." With respect to the larceny count, the jurors were told that one of the elements of that crime that "must be proved beyond a reasonable doubt [was] . . . that, at the time the defendant obtained such property, he intended to deprive the owner of his property." In concluding the discussion of this element, the court instructed that "the state must prove beyond a reasonable doubt the defendant took the property for the purpose of keeping or using it permanently."

The charge on the count of assault in the second degree also included specific references to the necessity for proof beyond a reasonable doubt of the mental element of that crime, the intent to cause physical injury: "The intent needed to satisfy this particular sub-section of the statute requires the intent to cause physical injury. Physical injury means any impairment of physical condition or any pain. If you find that the state has proved beyond a reasonable doubt the elements of this offense, you will find the defendant guilty of assault in the second degree."

B

In claiming that "inferred facts" in a criminal case must be proved beyond a reasonable doubt and that the jurors should have been so instructed, the defendant has created an ambiguity by failing to define that term, which literally would include all the inferences of fact drawn during the course of a trial regardless of their significance. The term may also refer only to those inferences that constitute proof of the elements of the crime charged. "Where a group of facts are relied upon

for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt." *State* v. *McDonough*, 205 Conn. 352, 355, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988). Inferences of subordinate facts relied on cumulatively for proof of an element of a crime ordinarily need not be proved by any standard other than common sense. When a particular fact is essential to establish such an element, however, that fact must be proved in accordance with the reasonable doubt standard.

In the context in which the defendant has used the term "inferred facts" in his brief, we understand it to refer to those facts relating to the element of intent required for each of the crimes of which he was found guilty, larceny and assault in the second degree. We have previously recited the portions of the charge in which the trial court defined the essential mental element for each of those crimes and unequivocally instructed the jurors that their determination of those elements was to be guided by the standard of reasonable doubt. We conclude, therefore, that there is no substance to the defendant's claim that the jury instructions failed to inform the jurors that the state bore the burden of proving the facts essential to establish each element of the crimes beyond a reasonable doubt. Thus, the defendant has not demonstrated that the "alleged constitutional violation clearly exists and clearly deprived [him] of a fair trial," as required by *Golding* for an appellant to prevail on an unpreserved claim. *State* v. *Golding*, supra, 213 Conn. 239–40.

## III

## SELECTION OF JURORS

The defendant's final ground for seeking a new trial is that, during the process of jury selection, the trial judge was absent from the voir dire and another judge was substituted for him during the morning of the second day of voir dire examination. The defendant claims that (1) this deviation from the usual procedure, with the same judge presiding throughout the voir dire as well as the remainder of the trial, violated the strictures for jury selection established by our Supreme Court in *State* v. *Patterson*, 230 Conn. 385, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 1290 (1996), and (2) the substitution was contrary to approved practice and violated his right to a fair trial.[3]

## A

In *Patterson*, our Supreme Court condemned the practice, which had become widespread, of allowing counsel to conduct the voir dire for jury selection, in criminal as well as civil cases,[4] without judicial supervision. Although no party had objected to that procedure, the court overruled it prospectively and established a requirement for the continued presence of a judge during jury selection: "The presence of the trial judge from the beginning of voir dire impresses upon the jury the gravity of the proceedings. The uninterrupted supervision of the proceedings by the judicial authority, mind-

[3] The state claims that any infirmity in the voir dire proceedings is unreviewable because the defendant consented to the substitution of judges that occurred and the issues raised on appeal do not qualify for review pursuant to *State* v. *Golding*, supra, 213 Conn. 233. We disagree. In *State* v. *Patterson*, supra, 230 Conn. 400, our Supreme Court stated explicitly that the requirement for the presence of a judicial authority during voir dire could not be waived by the parties.

[4] In *Patterson*, the court did not decide whether the practice of selecting the jury without judicial supervision in civil cases would be discontinued. *State* v. *Patterson*, supra, 230 Conn. 397 n.12.

ful of everything that transpires in the courtroom, is an important part of the appearance that justice is being done in a criminal case. . . . [W]e now decide under our supervisory power that henceforth the trial judge must continuously be present to oversee voir dire *in a criminal case.* Because this requirement is imposed by this court pursuant to its supervisory powers, the requirement cannot be waived by either party in future criminal cases." (Citations omitted; emphasis added.) Id., 398–400.

The *Patterson* decision was released on July 26, 1994, and, therefore, applies to this case in which jury selection began on December 20, 1994, with Judge Karazin presiding. After several jurors had been chosen, the judge informed counsel that he had to attend a meeting in Hartford the next morning, but would return for the afternoon session of the court. Later, the judge advised that arrangements had been made for Judge Dean to preside over the voir dire session on the following morning. Both the state and the defendant consented to the substitution. By the end of the first day of jury selection, six jurors had been chosen. Judge Karazin stated that Judge Dean would preside the next morning over the selection of two alternate jurors.

The next day, two alternates were selected during the morning session over which Judge Dean presided. Judge Karazin returned for the afternoon session and gave some preliminary instructions about trial procedure and proper juror conduct during a trial. All of the testimony was presented during the afternoon session before the six jurors and the two alternates.

The next morning, counsel for the defendant moved for a mistrial on the ground that two jurors had seen the defendant being brought into the courthouse wearing handcuffs. After questioning the jurors involved, the court excused them and substituted the two alternate

jurors chosen while Judge Dean was conducting the voir dire. The verdict was rendered by a jury composed of four jurors selected while Judge Karazin presided and two others selected during Judge Dean's substitution.

The defendant contends that *Patterson* requires the continuous presence of the same judge throughout the jury selection process. He finds some support for that position in the predominant use of the definite article "the" rather than the indefinite "a" as the modifier of "trial judge" throughout the *Patterson* opinion. In addition, the opinion refers to "[t]he uninterrupted supervision of the proceedings by the judicial authority"; id., 398; "the judge who is continuously present at a criminal voir dire"; id., 399; and "the greater likelihood of accuracy in fact-finding resulting from a judge's continuous presence . . . ." Id., 400. There are also, however, several indefinite references: "right to judicial supervision"; id., 393; "presence of a judge"; id.; "continuous judicial supervision"; id., 397; "judicial authority"; id., 398; and "a judge's continuous presence . . . ." Id., 400.

The *Patterson* opinion cites several considerations involving jury trials of criminal cases as the reasons for abolishing the practice of permitting counsel to conduct the voir dire examination of prospective jurors in the absence of a judge: (1) "The presence of the trial judge from the beginning of voir dire impresses upon the jury the gravity of the proceedings. The uninterrupted supervision of the proceedings by the judicial authority, mindful of everything that transpires in the courtroom, is an important part of the appearance that justice is being done in a criminal case." Id., 398. (2) "Further, the judge ought to protect the legitimate privacy interests of prospective jurors." Id., 399. (3) "The judge is charged with ruling on challenges based on the purposefully discriminatory use of peremptory challenges. *Balson* v. *Kentucky,* [476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] . . . . [F]irsthand observations ordinarily are a

more reliable way to make the factual determinations required of the trial judge during criminal voir dire, particularly those sensitive determinations implicated in a *Batson*-type challenge." *State* v. *Patterson*, supra, 230 Conn. 398–99. Of these considerations, we do not perceive how the first, impressing the jurors with the seriousness of a criminal trial, and the second, protecting their privacy from improper probing by unfettered counsel, would be thwarted in any significant measure by a substitution of one judge for another during the voir dire. The third consideration, the advantage of firsthand observations in deciding factual issues during voir dire, as when a *Batson* challenge arises, however, cannot be gainsaid.

In this case, however, no *Batson* challenge arose at any time and, during the selection of the two alternate jurors, neither counsel for the state nor for the defendant objected to any of the questions to prospective jurors. Judge Dean had no occasion to make any rulings while he presided over that portion of the voir dire. The defendant, therefore, cannot show that he was adversely affected in any manner by the substitution to which he had consented. We conclude, therefore, that this case is distinguishable from *Patterson*, which dealt solely with the conduct of jury voir dire examination without *any* judicial authority in the courtroom.

B

The propriety of substituting a different judge for the judge who presided at the start of a legal proceeding depends greatly on the nature of the proceeding and the likely impact on a criminal defendant's right to a fair trial. In the early case of *Freeman* v. *United States*, 227 F. 732, 759–60 (2d Cir. 1915), in which such a substitution, to which the defendant consented, occurred after the prosecution had presented all of its evidence, the court declared that "[t]he continuous presence of the same judge and jury is equally essential throughout the whole of the trial." The holding in *Patton* v. *United*

*States*, 281 U.S. 276, 293–98, 50 S. Ct. 253, 74 L. Ed. 854 (1930), that a defendant may waive his right to have the same jurors present throughout his trial by consenting to a verdict rendered by fewer than twelve jurors, however, has undermined the rationale of the *Freeman* decision. *United States* v. *LaSorsa*, 480 F.2d 522, 531 (2d Cir. 1973). In the absence of a procedural rule[5] or statute[6] permitting such midtrial substitutions, the general rule remains "that a judge may not be substituted to preside over the remainder of a trial after evidence has been adduced before the original judge." 46 Am. Jur. 2d, Judges § 249 (1994). "[T]he rule against substitution is designed to insure that the judge who hears the testimony as to the facts also applies the law thereto." Annot., 83 A.L.R.2d 1032, 1034 (1962). The current rule, however, recognizes that the defendant may waive any objection to such a substitution by consenting or by failing to object thereto. Id. When a seasonable objection is raised, some courts hold that a substitution, even after evidence has been presented, is subject to harmless error analysis. *McIntyre* v. *State*, 266 Ga. 7, 463 S.E.2d 476 (1995); *Hood* v. *State*, 334 Md. 52, 62, 637 A.2d 1208 (1994).

---

[5] Rule 25 of the Federal Rules of Criminal Procedure, adopted in 1966, permits the substitution of a judge after commencement of a jury trial if the original judge becomes unable to proceed with the trial "by reason of death, sickness, or other disability." The substitute judge is required to familiarize himself with the prior proceedings. The rule was upheld against constitutional attack in *United States* v. *LaSorsa*, supra, 480 F.2d 530–31.

[6] General Statutes § 51-183 provides: "Any judge of the Superior Court may hold any term or session or part of any term or session of court to which another judge has been assigned, when the latter is unable to hold or complete it; and any judge may try any action when the judge holding court is disqualified or declines to try it." The state argues that the first sentence of the statute would authorize the substitution that occurred in this case. Such an expansive interpretation of the first sentence, however, would render the second sentence superfluous. We agree with the defendant that the second sentence, which relates expressly to the trial of "any action" rather than to holding "any term or session or part of any term or session of court," is a far more precise reference to the substitution of a judge in a particular case, but it does not authorize a substitution once a trial has begun.

The rule against substitution of judges after testimony has commenced is not applicable to jury selection proceedings unless there is a showing of prejudice. "[T]he great weight of authority favors the rule that substitution of a judge before opening argument or the admission of evidence is not an automatic ground for reversal." 46 Am. Jur. 2d, Judges § 249 (1994). "The examination of jurors under voir dire does not elicit any information that can be used in the trial of the case; [rather] such examination is merely for the purpose of securing a competent, fair, and unprejudiced jury. That function can properly be performed by any judge." *Commonwealth* v. *Thompson*, 328 Pa. 27, 29, 195 A. 115 (1937). Most of the cases take the view that, after voir dire, the substitution of a different judge for the remainder of the trial, absent a showing of prejudice, is not a basis for reversal of a criminal conviction. *Jones* v. *State*, 57 Ala. App. 275, 327 So. 2d 913, cert. denied, 295 Ala. 409, 327 So. 2d 915 (1975); *State* v. *Wallen*, 114 Ariz. 355, 360, 560 P.2d 1262 (App. 1977); *People* v. *Rodriguez*, 786 P.2d 472 (Colo. App. 1989); *People* v. *McCline*, 442 Mich. 127, 499 N.W.2d 341 (1993). Some courts have frowned on the practice of substitution at any stage of a trial, but, nevertheless, have affirmed the convictions when the new judge entered the case before the evidentiary phase of the trial began. *State* v. *Amarillas*, 141 Ariz. 620, 622, 688 P.2d 628 (1984) ("not the best practice"); *State* v. *Wallen*, supra, 360 ("[not] a good practice").

The defendant focuses on substitutions occurring during jury selection, as in the present case, thus distinguishing some of the precedent. None of the cases we have found involving that situation has attributed any special significance to it and they support the general rule that substitutions prior to the introduction of evidence are not a basis for reversal. *State* v. *Amarillas*, supra, 141 Ariz. 620; *People* v. *Rodriguez*, supra, 786

P.2d 472; *Commonwealth* v. *Thompson,* supra, 328 Pa. 27. We agree with the defendant that the advent of *Batson* challenges raises new concerns about the need for the same judge during the jury selection proceeding. In this case, however, no such problem arose. The defendant consented to the substitution, and there has been no showing of prejudice resulting therefrom. We conclude that the substitution of judges that occurred in this case is no basis for reversal of the defendant's conviction.

The judgment is affirmed.

In this opinion the other judges concurred.